88 P.3d 657

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Sidney F. TAFOKITAU, Defendant–Appellant,**

and

**Mikaele Fatai, Jr. and Phillip L. Pola, Defendants.**

**No. 25075.**

Intermediate Court of Appeals of Hawai'i.

March 19, 2004.

James S. Tabe, Deputy Public Defender, on the briefs, for defendant-appellant.

Daniel H. Shimizu, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

WATANABE, Acting C.J., LIM and FOLEY, JJ.

Opinion of the Court by FOLEY, J.

Defendant-Appellant Sidney F. Tafokitau (Tafokitau) appeals the Judgment filed on April 5, 2002 in the Circuit Court of the First Circuit (circuit court).[1]

Tafokitau was charged with and convicted of:

Counts I through VI: Robbery in the First Degree, in violation of Hawaii Revised

---

1. The Honorable Richard K. Perkins presided.

Statutes (HRS) § 708–840(1)(b)(ii) (1993 & Supp.2003) [2];

Count XIII: Place to Keep Firearm Loaded with Ammunition, in violation of HRS § 134–6(d) and (e) (Supp.2003) [3]; and

Count XIV: Ownership or Possession Prohibited of Any Firearm or Ammunition By a Person Convicted of Certain Crimes, in violation of HRS § 134–7(b) and (h) (Supp. 2003).[4]

On appeal, Tafokitau contends the circuit court erred (1) by admitting into evidence hearsay testimony of a witness and (2) by denying Tafokitau's oral motions for judgment of acquittal. We affirm.

## I.

On the night of May 24, 2001, Yun Lin (Lin) was working at 835 Ke'eaumoku Street, Suite 201, as a doorman for a gambling room. Suite 201 was on the second floor of the building. Lin testified at trial that a security person, who was with Lin at the security station, opened the door to the gambling room and three people entered the establishment. Lin saw one man enter with a "long" gun approximately thirty-six inches in length, one man enter with a "short" gun, and one man enter with a bag and knife. The man carrying the bag and knife hit Lin on Lin's left side with the handle of the knife, after which Lin fell to the ground. The man with the bag then collected money from other people in the gambling room and took more than $400 from Lin. Lin testified that he thought some of the men were wearing masks at the time of the robbery, but also stated "they wouldn't allow me to look at them."

Qian Bao Cai (Cai) was at the gambling room on the night of May 24, 2001. Cai testified that he saw three males enter the gambling room, but could not recognize them because one or two of the men were wearing dark glasses and one had his face covered.

2. Hawaii Revised Statutes (HRS) § 708–840 (1993 & Supp.2003) provides in relevant part:
   **§ 708–840 Robbery in the first degree.** (1) A person commits the offense of robbery in the first degree if, in the course of committing theft:
   . . . .
   (b) The person is armed with a dangerous instrument and:
   . . . .
   (ii) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.
   (2) As used in this section, "dangerous instrument" means any firearm, whether loaded or not, and whether operable or not, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury.
   (3) Robbery in the first degree is a class A felony.

3. HRS § 134–6 (Supp.2003) provides in relevant part:
   **§ 134–6 Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.**
   . . . .
   (d) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this subsection shall not apply to any person who has in the person's possession or carries a pistol or revolver and ammunition therefor in accordance with a license issued as provided in section 134–9.
   (e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

4. HRS § 134–7 (Supp.2003) provides in relevant part:
   **§ 134–7 Ownership or possession prohibited, when; penalty.**
   . . . .
   (b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.
   . . . .
   (h) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. Any person violating subsection (c), (d), (e), (f), or (g) shall be guilty of a misdemeanor.

Cai also saw the three males carrying one "long" gun, one "short" gun, and a knife ten to twelve inches in length, respectively. A man carrying a gun kicked Cai in the head while Cai was squatting down looking at the ground. The man with the bag and knife removed Cai's wallet from Cai's back pants pocket and took about $200. Cai testified that he could not identify any of the defendants because he did not see the faces of the robbers. Cai testified that he was not asked by police to look at any gun or knife after the robbery occurred.

Eun Sook Lee (Lee) was also at the gambling room on the night of May 24, 2001. Lee saw one man wearing a mask and holding a "small" gun and one man with a bag and knife. Lee had a gut feeling that there were more than two men. The men yelled "stay down, don't look up," and the man with the bag and knife said "give me everything you got." Lee gave the men $4,000 because she did not want to get hit or hurt. Lee could not identify the height, weight, hair color, or nationality of the robbers. Lee was not asked by police to identify a bag, gun, mask, knife, or a voice recording.

Cun Xu (Xu) was working at the gambling room as a chip dealer on the night of May 24, 2001 when it was robbed around 11:00 p.m. Xu saw three males—one carrying a "short" gun, one carrying a long rifle, and one carrying a backpack and knife. Xu testified that the man carrying the backpack and knife said "give me the money," and people put money into the bag when the man passed by. Xu took out a $100 bill from his wallet and put it into the bag because the man holding the bag threatened him with the knife. Xu admitted that he did not mention that one man had a "long" gun when he gave a statement to police shortly after the robbery. Xu also did not mention someone with a "long" gun at a hearing held May 31, 2001 in the case.

Dung Quoc Chung (Chung) was at the gambling room on the night of May 24, 2001. Chung testified that a person holding a black "bag" and knife said "everyone had to take out their wallet and money out" and put the money in the bag. Chung placed five $20 bills in the bag because that person ordered everyone to put their money into the bag and Chung was afraid he might get hurt. Chung only saw two men commit the robbery. Chung stated the two men did not wear masks. Chung described the gun as a black .38. Chung was not shown a gun, knife, or bag when he was questioned at the police station on May 25, 2001. Chung could not identify the defendants as the men who committed the robbery because he was lying down on the ground.

Sung O.K. Ku (Ku) testified that he was at the gambling room during the robbery on May 24, 2001 and saw three men—one holding a gun, one holding a knife, and one with a backpack. The man with the backpack was collecting money from the people lying on the floor. The man holding the backpack took Ku's wallet, which had $140, from Ku's hand while Ku was lying on the floor. While he was lying on the floor, Ku asked for his wallet back, but the man did not respond. Ku also stated that two of the men were standing in front of the big gambling table while the man with the backpack was collecting money. Approximately three minutes after the men left the gambling room, Ku followed them outside.

Ku testified that he saw two of the men walk past the parking lot of the Korean/Chinese restaurant. Ku asked the first man for his wallet back, but the man did not respond and walked past Ku towards the Maui Divers parking lot. Ku identified Tafokitau's co-defendant, Mikaele Fatai, Jr. (Fatai), as the first man who walked past him. Ku testified that Fatai was one of the men who had been holding either a gun or a knife in the gambling room.

Ku testified that the second man to walk past him had a backpack. Ku had an "instinctive feeling" that this second man was the man in the gambling room who had placed Ku's wallet into the backpack because Ku recognized the outline of the man and because the man had on the backpack. Ku asked the man with the backpack for his wallet back, but the man did not respond and walked in the direction of the Maui Divers parking lot. Ku saw a police car pass by, but did not signal to the officer.

The police car turned around and came back toward Ku. Ku testified that he stopped the police car and told the police officer "hey, somebody had taken my wallet." While Ku was talking with the police officer, the man with the backpack was going into the alley near the Maui Divers store. Ku did not see the other two men from the gambling room by the time he saw the police car pass by. After Ku said someone had his wallet, the police officer said "who and where." Ku said "he's over there," and the officer went over to the other person.

Ku testified that the officer chased the man with the backpack into an alley and Ku followed a couple of feet away from the officer. Ku heard a loud sound and then saw the man, who had previously been carrying the backpack, lying flat on his back. Ku testified that he did not recognize the man's face, but Ku confirmed that the man he pointed out to the officer as the person who had his wallet was also the same man on the ground. Ku knew the man on the ground was the same man he had asked to return his wallet because the man's "backpack was green in color and he had that backpack on, so I knew it was him." Ku and the officer found the backpack in the rubbish can.

Police Officer Roel Gapusan (Officer Gapusan) testified that on the night of May 24, 2001, while on a routine patrol, he stopped on Liona Street off of Ke'eaumoku to allow two males to cross the street in front of him. The two males were walking across the street "kind of suspicious, standing real close to each other." One of the males had slippers in his left hand, and both kept looking at Officer Gapusan while crossing in front of him. Officer Gapusan made a U-turn at the next intersection and went back. As he made the U-turn, he saw two other males cross the street behind the first two males. Officer Gapusan identified the first set of two males as Tafokitau and Fatai and the second set of two males as Tafokitau's co-defendant Phillip Pola (Pola) and Cui (Ku).[5]

Officer Gapusan testified that "Mr. Cui [Ku] hysterically started waving at me, running towards me. And when I rolled down my window he pointed towards the three males and stated that they stole my wallet." Officer Gapusan saw Tafokitau and Fatai run through a parking lot. Ku pointed to Pola and said his wallet was in the backpack Pola was carrying. Officer Gapusan pursued Pola, but, after Pola made a turn, Officer Gapusan lost sight of him. Some people in front of "Golden Dolls" pointed and said Pola had gone into the alley around the corner. Officer Gapusan turned into the alley and saw Pola throwing the backpack and his jacket into a dumpster. Officer Gapusan stated "police, stop," but Pola finished throwing the backpack into the dumpster, put his hands up in an aggressive manner, and walked towards Officer Gapusan. Officer Gapusan struck Pola because Pola would not stop, and Pola fell to the ground. Officer Gapusan testified that after he handcuffed Pola, Ku came over and said "yeah, .that's the guy"; Pola's defense counsel objected to this testimony. Officer Gapusan asked Ku if Pola was the person, and Ku said yes.

Two wallets (including Ku's wallet), a .38 caliber round of ammunition, three .410 shotgun rounds, two semi-automatic magazines, a tin can containing ammunition, a pair of yellow rubber gloves, one latex glove, $5,858 in cash, and a razor blade similar to a box cutter were found in the backpack. A latex glove was recovered near a trash bin at the base of the steps leading up to the gambling room. Another latex glove and a white undershirt were recovered from within that trash bin.

After handcuffing Pola, Officer Gapusan backtracked from the alley, through the parking lot of "Golden Dolls," and into the parking lot of Bank of Hawaii, where his vehicle was parked. Officer Gapusan noticed a blue van parked four stalls away from his vehicle. Officer Gapusan ran a check on the plates of the van, which showed that the van belonged to Anna Tafokitau (Tafokitau's mother).[6] Officer Gapusan noticed the slid-

5. Officer Gapusan's identification of Cui is taken as Ku because there was no witness named Cui, Ku testified that he stopped Officer Gapusan, and

Officer Gapusan testified that it was Cui (Ku) who stopped him.

6. During the trial, Tafokitau stipulated that the van belonged to his mother and that he "parked

ing door on the side of the van was partially open, and he could see a firearm under the front passenger seat. A knife and shotgun were recovered from the blue van. Based on information provided by a parking lot attendant, Police Officer Garrett Maluenda (Officer Maluenda) checked the area where the robbery suspects were last seen. Officer Maleunda found a handgun in an empty planter in the alleyway next to "Golden Dolls."

Police stopped Tafokitau, Fatai, and Sione Fatai (Sione), Fatai's older brother, in a red car on Beretania Street. Police Officer Kalae Phillips (Officer Phillips) testified that Tafokitau and Fatai were not wearing shirts when they were stopped. A loaded revolver containing six .38 caliber rounds was recovered from under the front passenger seat of the red car. Police Officer Daniel Sellers (Officer Sellers) testified that Tafokitau was in the front passenger seat when the car was stopped. Officer Gapusan was instructed to go to a location at Beretania and Makiki Streets for a "field show-up"; he identified Tafokitau and Fatai. Ku was brought by police officers to this "field show-up," but Ku did not recognize any of the three men.

Police Officer Jon Thomas (Officer Thomas) testified that when he was escorting Fatai from the police interview room to the receiving desk, Fatai asked: "You guys found a 380?"

Sione testified that he was in the vicinity of Makiki and Beretania Streets on May 24, 2001, and he picked up his brother Fatai and friend Tafokitau in his red Pontiac. Sione testified that he cleaned out his car once a week and had cleaned it out on the Saturday before Thursday, May 24, 2001. He did not keep any type of firearm in his vehicle, and there was no firearm in his vehicle when he cleaned it on Saturday. Sione testified that he had not placed a gun under the front passenger seat of his vehicle, he did not think he had a gun in his car when he drove to pick up his brother, nothing was in the front passenger seat when he drove to pick up his brother, and the gun found in the car did not belong to him.

the van in the location where it was discovered by members of the Honolulu Police De-

It was stipulated that Tafokitau was a convicted felon prior to May 24, 2001; was aware that he was prohibited from owning, possessing, or controlling any type of firearm or ammunition; did not have a license issued by the chief of police of the City and County of Honolulu to carry a firearm or ammunition; and was aware that he had no license to carry a pistol or revolver.

Pola, Tafokitau, and Fatai were tried together. Pola, Tafokitau, and Fatai did not testify and did not present any evidence. Tafokitau, Fatai, and Pola were convicted as charged. Tafokitau timely filed a Notice of Appeal on May 2, 2002. Pola also filed an appeal.

## II.

### A. Admissibility of Evidence—Hearsay

■ "We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz,* 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

■ We apply the right/wrong standard to questions of hearsay:

The requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result. HRE [Hawaii Rules of Evidence] Rule 802 (1993) provides in pertinent part that hearsay is not admissible except as provided by these rules. HRE Rules 803 and 804(b) (1993) enumerate exceptions that are not excluded by the hearsay rule. With respect to the exceptions, the only question for the trial court is whether the specific requirements of the rule were met, so there can be no discretion. Thus, where the admissibility of evidence is determined by application of the hearsay rule, there can generally be only one correct result, and the appropriate standard for appellate review is the right/wrong standard.

part[ment]."

*Ortiz*, 91 Hawai'i at 189–90, 981 P.2d at 1135–36 (internal quotation marks, citations, footnote, and brackets in original omitted; bracketed material added) (quoting *State v. Christian*, 88 Hawai'i 407, 418, 967 P.2d 239, 250 (1998)).

### B. Motion For Judgment Of Acquittal

When reviewing the grant or denial of a post-verdict motion for a judgment of acquittal,

> we employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

*State v. Jhun*, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996) (citations and internal quotation marks omitted).

*State v. Timoteo*, 87 Hawai'i 108, 112–13, 952 P.2d 865, 869–70 (1997):

### III.

**A. The circuit court did not err by admitting hearsay testimony under Hawaii Rules of Evidence (HRE) Rule 802.1(3).**

■ Tafokitau contends the circuit court erred by admitting hearsay testimony of Officer Gapusan into evidence. Specifically, Tafokitau objects to the admission of Officer Gapusan's testimony that "Mr. Cui [Ku] hysterically started waving at me, running towards me. And when I rolled down my window he pointed towards the three males and stated that they stole my wallet." The State contends the testimony of Officer Gapusan was properly admitted into evidence as an exception to hearsay under HRE Rule 802.1(3).

Tafokitau relies on *State v. Ildefonso*, 72 Haw. 573, 827 P.2d 648 (1992), to support his argument that the circuit court incorrectly applied HRE 802.1(3). Tafokitau contends that under *Ildefonso*, a witness, in addition to testifying at trial regarding the circumstances of the prior out-of-court statement and being subject to cross-examination, must vouch for the accuracy of the hearsay statement attributed to the witness in order for the statement to be admissible as an exception to hearsay under HRE Rule 802.1(3).

Hawaii Rules of Evidence Rule 802.1(3) provides:

> **Rule 802.1 Hearsay exception; prior statements by witnesses.** The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:
>
> . . . .
>
> (3) Prior identification. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, and the statement is one of identification of a person made after perceiving that person[.]

■ A police officer may testify as to the prior identification by a witness, but only where the person making the identification "is present at trial, testifies to the prior identification, and is subject to cross-examination." *State v. Naeole*, 62 Haw. 563, 570, 617 P.2d 820, 826 (1980). "[H]earsay . . . may still be admissible as a prior identification under Haw. R. Evid. 802.1(3) if (1) the declarant testifies at trial and is subject to cross-examination concerning the subject matter of his statement and (2) the statement is one of identification of a person made after perceiving him." *State v. Motta*, 66 Haw. 254, 262, 659 P.2d 745, 750–51 (1983). "[T]he prior identification exception under Fed. R.Evid. 801(d)(1)(C) (and under Haw. R. Evid. 802.1(3)) allows the admission of pretrial identifications, not merely as corrobora-

tive evidence, but also as substantive proof of identity." *Motta,* 66 Haw. at 262, 659 P.2d at 751.

In his opening brief, Tafokitau points to the following language in *Ildefonso* that the Hawai'i Supreme Court quoted from a Superior Court of Pennsylvania opinion:

> In our view, a prior statement of identification made by a witness who does not make an in-court identification at trial qualifies for exception to the hearsay rule only if (1) the out-of-court identification was freshly made, and (2) *the witness who made it takes the stand and vouches for its accuracy ....* (In addition, when offered against defendant in a criminal case, the witness must be subject to adequate cross-examination in order to satisfy defendant's constitutional right to confront the witness against him.)

72 Haw. at 580, 827 P.2d at 653 (emphasis added) (quoting *Commonwealth v. Floyd,* 327 Pa.Super. 569, 577, 476 A.2d 414, 418 (1984)[7]). Tafokitau argues that the Hawai'i Supreme Court's quoting of the language in *Floyd* meant the Hawai'i Supreme Court held that the police officer's prior identification in *Ildefonso* was admitted as an exception to the hearsay exclusionary rule under HRE Rule 802.1(3) because the witness who made the prior statement of identification took the stand and vouched for its accuracy.

The plain language of HRE Rule 802.1(3) states that there are only two requirements to admit a prior statement as an exception to the hearsay exclusionary rule for the purposes of identification: (1) the declarant must be subject to cross-examination, and (2) the statement must be one of identification of a person made after perceiving that person.

In *Naeole* and *Motta,* the Hawai'i Supreme Court did not require the declarant to vouch for the accuracy of the prior identification. *Naeole,* 62 Haw. at 570, 617 P.2d at 826;

*Motta,* 66 Haw. at 262, 659 P.2d at 751. The court in *Motta* stated: "Given the fact that the jury was given the opportunity to judge the credibility of both the police artist and the eyewitness at trial, we find no reason to disturb the trial court's discretion in admitting the sketch into evidence." 66 Haw. at 263, 659 P.2d at 751. The *Motta* court allowed the lower court judge to admit hearsay evidence and let the jury weigh the credibility of the police artist and eyewitness without the need for the eyewitness to vouch for the accuracy of the prior identification.

In *Ildefonso,* the Hawai'i Supreme Court made reference to Pennsylvania as one of two jurisdictions (the other was Oklahoma) where "[e]ven in cases where prior identifications were deemed to be inadmissible, courts have agreed that such testimony would be admissible as independent proof of identity if certain foundational or procedural requirements were met." *Ildefonso,* 72 Haw. at 579, 827 P.2d at 652. In *Ildefonso,* the police officer witness vouched for the accuracy of his out-of-court identification of defendant, as did the witness in *Floyd.* The Hawai'i Supreme Court's citation and reference to *Floyd* must be read within the context of its entire opinion in *Ildefonso.* Such a reading makes it clear that the court did not intend to reverse its holdings in *Naeole* and *Motta* or change the express requirements of HRE Rule 802.1(3).

There is no requirement that a declarant vouch for the accuracy of a hearsay statement attributed to the declarant in order to qualify as an exception to hearsay under HRE Rule 802.1(3). Any interpretation of HRE Rule 802.1(3) that requires a declarant to vouch for the accuracy is not supported by the plain language of the rule. Such an interpretation would be inconsistent with *Motta* (cited with approval in *Ildefonso* ), which allowed the trier of fact to weigh the

---

7. In *Commonwealth v. Doa,* 381 Pa.Super. 181, 553 A.2d 416 (1989), the Pennsylvania Superior Court reversed *Floyd* by declaring "[h]ence, the traditional rule utilized in *Floyd* is no longer the law of the Commonwealth." *Doa,* 381 Pa.Super. at 187, 553 A.2d at 419. In *Doa,* the issue was one "where an eyewitness has made a prior identification but is unable to identify the defendants at trial and another witness is called to

testify as to the eyewitness's prior identification." *Id.* at 189, 553 A.2d at 419 (footnote omitted). The court in *Doa* explained the rationale for admitting the prior identification by stating "[i]f the accounts of two witnesses vary, the factfinder may accept or dismiss any portion of either witness's testimony." *Id.* at 195, 553 A.2d at 423. The Hawai'i Supreme Court failed to note the reversal in *Doa* of the holding in *Floyd.*

credibility of the witnesses when there was contradictory testimony from a declarant and another witness regarding the declarant's prior identification.

Ku testified at trial and was subject to cross-examination. The circuit court did not err by admitting the hearsay testimony of Officer Gapusan under HRE Rule 802.1(3).

### B. The circuit court did not err by denying Tafokitau's oral motions for judgment of acquittal.

There was sufficient evidence to support a prima facie case so that a reasonable mind might fairly conclude Tafokitau was guilty beyond a reasonable doubt of Counts I through VI (Robbery in the First Degree), Count XIII (carrying a firearm in violation of HRS § 134–6(d)), and Count XIV (possession of a firearm in violation of HRS § 134–7(b)).

### IV.

The Judgment filed on April 5, 2002 is affirmed.