114 P.3d 945

**In the Interest of John DOE, Born on July 8, 1987, Minor–Appellant.**

**No. 25580.**

Intermediate Court of Appeals of Hawai'i.

June 1, 2005.

8. This count was subsequently dismissed with prejudice by stipulation of the parties.

Opinion of the Court by BURNS, C.J.

Minor–Appellant John Doe (Doe), born on July 8, 1987, appeals from (1) the October 2, 2002 Decree Re: Law Violation Petitions and (2) the January 22, 2003 Findings of Fact and Conclusions of Law and Order Denying Motion for Reconsideration entered in the Family Court of the First Circuit.[1]

Doe asserts the following points of error:

A. The court erred in denying Doe's motion for reconsideration as to its denial of his motion to hear the motion to suppress prior to trial.

B. The court erred in denying Doe's motion to suppress where the show-up procedure used by the police was impermissibly suggestive and, upon viewing the totality of the circumstances, the complaining witness's identification was not sufficiently reliable.

C. Doe's adjudication as a law violator as an accomplice to the offense of robbery in the first degree must be reversed where there was no substantial evidence that the "little black stick" used by the taller male was a "dangerous instrument".

We affirm.

As indicated in Doe's point of error "A" above, there was a combination evidentiary hearing on the pre-trial motion to suppress and the trial on the merits. The record on appeal contains two transcripts of that one hearing. The transcript prepared by Florencia L. Fines reflects that it is for the motion to suppress. The transcript prepared by A. Haunani Ho does not limit itself. As did the parties, we will cite to the latter transcript.

I.

BACKGROUND

On March 12, 2001, Sharmain Pedro (Pedro) was spending time with her college friends in Waikīkī. At around eight o'clock in the evening, Pedro received a call from her husband suggesting that Pedro come home since she had taken Naproxen[2] earlier

Jon N. Ikenaga, Deputy Public Defender, on the brief, for Appellant.

Mark Yuen, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief, for Appellee.

BURNS, C.J., WATANABE and LIM, JJ.

1. The Honorable Linda K.C. Luke, presided.

2. Naproxen is a muscle relaxant that Sharmain Pedro had been taking after her injury in a motorcycle accident.

during the day. Pedro advised her husband that "it would be a while[.]" At "about 11:00" they made plans for Pedro to go to the zoo and to call her husband when she got there. When Pedro and her friends were unable to find their way to the zoo, Pedro was dropped off on Ala Wai Boulevard near Paoakalani Street. Pedro was walking along Ala Wai Boulevard when she heard footsteps behind her. She turned to look behind her because she was walking a little slow with a cane and she wanted to "see which way they're coming so [she] can then move over to the left or to the right[.]" Pedro stated that she saw two males "walking fast" towards her and that they were yelling at her and asking if she "had a couple dollars ... to spare." Pedro testified that by the time she "shook [her] head no" they were about "5 feet [away] from [her]." The taller male was "wearing a white shirt, and the blue jeans and some tennis shoes." The shorter male was "wearing a beige shirt and, ... some windbreaker pants and slippers." Both males were "kind of gasping for air and breathing really heavy" and "sweating". The taller male "kind of reeked of alcohol and just body odor." Pedro asked the males to leave her alone. The taller male asked her if she "had a boyfriend" and "for [her] number[.]" When the taller male "got in [her] face" she "was then turned sideways." As she was getting ready to turn back to walk, the shorter male "was already in front of [her,]" "very close to [her]." Pedro then noticed that the taller male was holding "like a little black stick" that stuck out of his hand about three inches. The taller male struck Pedro's face. Pedro put her face down because she felt it "burning". "The extreme pain started when [she] was cut on the face with that instrument that the tall boy had[.]" Pedro heard the shorter male tell the taller male "to grab [Pedro's] chains." Pedro grabbed the taller male's shirt in an attempt to stop him from striking her again. Pedro wrestled with the taller male and resisted the shorter male's attempts to take from her grasp her small, box Calvin Klein purse. Eventually, three necklaces, the purse, and a watch were taken from her. She curled up in a ball, saw the taller male's white tennis shoes "at her head and [she] felt two, three

kicks in [her] back." In her words, "By then, they—they were, um, tellin' each other, you know, let's go and laughing." Pedro dragged herself to a pole chain, pulled herself up, and called for help. She walked to a bus stop and laid down. After she told some people walking by that she needed help, the police came and an ambulance arrived to assist her.

While taking Pedro to the hospital, the ambulance detoured to Jefferson Elementary School where Pedro was asked to sit up and look at some people there to see if she could identify the person or persons who attacked her. Pedro looked through the ambulance window. She testified, in relevant part, as follows:

A Um, there was officers to the left, and there was people standing around on the street, and there was some officers, um, behind them. So there was a—a lot of people there.

Q Okay. Were they sort of evenly spread out or—

A Yes, pretty much.

Q When you saw—when you looked out the window, did you see the person that was ... with the tall boy on Paoakalani and he was—kicking you and grabbing your purse? Was that the same ... boy that did it?

A Um, yes.

Q . . . .

Okay. Can you describe for us, please, the—the clothing of—of the minor on that night?

A Um, he was wearing a tan shirt and tan pants and, um, he had a necklace around his neck and he was wearing slippers.

. . . .

Q ... How about the other one, the tall guy?

A Uh, he was wearing a white t-shirt and blue jeans and tennis shoes.

Q When you saw the ... minor at Jefferson Elementary School, was there anything different about his appearance then than when you had seen him earlier on Paoakalani?

A Um, I couldn't see his chain and he was wearing a different shirt.

Q What do you mean different?

A Um, he was wearing a red shirt then.

Q That wasn't the shirt he was wearing at the time on Paoakalani?

A No.

. . . .

Q . . . Was he wearing a necklace, . . . could you see that necklace on Paoakalani?

A Yes.

Q Did you see it on him at Jefferson Elementary School?

A Um, I saw it outside of his shirt.

Q Part of it?

A Yeah. Just a little bit.

Q Now, . . . are you actually sure that the boy who kicked you and who was with the tall boy and who grabbed your purse and who laughed as he ran away is the same boy sitting in this courtroom?

A Yes.

. . . .

Q Straub [Clinic & Hospital]. How long were you there, if you can remember?

A Um, total, um, a coupla [sic] hours, at least.

Q What things did they do at that time at Straub to you?

A Um, they were, um, checking my eye for scrapes and bruises and, um, cleaning my face, and I later on had stitches.

Officer Chris Bugarin (Officer Bugarin) of the Honolulu Police Department testified, in relevant part, as follows:

Q All right. How did you advise the ambulance where to go and what was gonna [sic] happen?

A I told them, um, if she doesn't have to go to the hospital right now, if she can identify the possible suspect, if he could follow me, we'll take you to the area where the possible suspect is, we'll light him up, and then she can just look through the window and if she can identify the guy or not.

Q Okay. Did you say we'll line him up or them up?

A Well, she'll take a pass by where the suspect was.

Q Okay. Do you remember—

A No, light. We'll light him up. Shine the lights on him.

Q Okay. And is that what happened?

A Yes.

Q And how was he lit up?

A Um, on the Cushman we have our— our side lights, and . . . someone parked the Cushman in front of him, shined the highlights, and then I went on the side of him and shined the—the light, the side light.

Q Was he the only person lit up like that, at this time the identification was taking place?

A Yes.

Q And was he in custody at that time?

A Yes.

Q Was he accompanied or within a foot or two or [sic] another uniformed police officer?

A Yes.

Q Was there anyone else standing that close to him?

A Uh, not that I can remember.

Q Were there any other civilians that were being highlighted or demonstrated as potential suspects?

A No, not that I can remember.

Q Okay. And were there a number of police cars there and Cushmans?

A I'd say about three or four.

Later that day, Pedro went to the police station to view a photographic line-up. Pedro selected picture no. 5, but with the following qualification:

Q In fact, weren't your words that you were not sure, but it looks like he could be the one?

A Yes.

Q And your other words were he may have been the one who robbed me? Correct?

A Yes.

Picture no. 5 was a picture of Doe.

On March 14, 2002, the State of Hawai'i filed a petition, pursuant to Hawaii Revised Statutes (HRS) Chapter 571, alleging as follows:

On or about the 13th day of March, 2002, in the City and County of Honolulu, State of Hawaii, [Doe] and an unknown person, while in the course of committing a theft, and while the unknown person was armed with a dangerous instrument, did use force against SHARMAIN PEDRO, a person who was present, with the intent to overcome the person's physical resistance or physical power of resistance, thereby committing the offense of Robbery in the First Degree, in violation of Section 708–840(1)(b)(i) of the [HRS].

On July 19, 2002, Doe filed a Motion to Suppress Identification of Minor. The motion asked the court to suppress the following for the reasons stated:

The pre-trial identification of the Minor made on the date of March 13, 2002, at the time of 1:15 a.m. at the place of [M]akee Road and Kuhio Ave., was unduly suggestive and unreliable.

The photographic identification of the Minor made on the date of March 13, 2002 at the time of 4:06 p.m., at the place of Wahiawa Police Station was also unduly suggestive and unreliable.

(Emphasis omitted.)

On October 2, 2002, immediately prior to trial, Doe requested that the court hear and decide the motion to suppress prior to commencing trial. Following arguments, the court orally ruled as follows:

At this time the ruling of the Court, since this is Family Court, under Chapter 571 ... specifically ... the Rules of Penal Procedure are not applicable, as counsel know. Therefore, the Court will join all issues for trial and will at the appropriate time entertain any motion by the public defender. But for the record, both the motion to suppress will be heard together with the underlying issues at trial.

Soon thereafter, the trial began. Pedro and Officer Bugarin testified as stated above.

The defense presented two witnesses. The first witness was Dominic Perreira (Perreira). Perreira testified that he was with Doe on the night of the incident. They took a bus from Mililani and had to get off at Nimitz Highway because their transfers expired. After waiting about fifteen minutes, they caught a taxicab to Waikīkī and proceeded to Makee Road. Perreira and Doe left the taxicab, hopped over a fence, and hid in a recycling bin at the Thomas Jefferson Elementary School. Perreira and Doe eventually left the recycling bin and split up in different directions. Perreira testified that he thought that he saw Doe head towards Pualani Way on the school grounds. This happened sometime between 11:00 p.m. and midnight.

Doe's second witness, Chau Nguyen (Nguyen) testified, through an interpreter, that he was the taxi driver who picked up the two young males near the airport that night. He identified Doe as one of the two young males. Nguyen testified that he stopped on Makee Street. When one of the young males asked him to "change a one hundred dollar bill[,]" Nguyen feared that he might be robbed so he "pick[ed] up [his] cellular phone with [his] car key, and [he] get off and [he] go around and open [other] side door and [he] open the door for them." Nguyen stated that after he opened the door, Doe asked him for money, so Nguyen "[ran] to Kuhio and [was] yelling." After Nguyen started yelling, the two males ran away.

Thereafter, Doe voluntarily, knowingly, and intelligently waived his right to testify.

At the conclusion of the October 2, 2002 trial, the court first considered the motion to suppress and decided as follows:

Based on the evidence reviewed, the Court is gonna [sic] deny the motion to suppress the identification based on the arguments of the prosecution and the Court's notes that do evidence the fact that this complaining witness did have opportunities on at least those four occasions to observe this minor.

In addition, there's additional testimony as to the actions of this minor with respect to the three kicks in her back, his speak-

ing, whether you got all the jewelry, did you grab the chains, and also her—his being in the face of the complaining witness.

For those reasons, the .Court is gonna [sic] [deny] the motion to suppress.

The court then considered the merits of the case and decided as follows:

Based on the review of the evidence and following hearing and after full consideration of the evidence, this case does in fact hinge on the accuracy or reliability of the complaining witness.

In this case, I believe [Pedro] did have ample opportunity to certify to this Court that [Doe] is the perpetrator of the robbery charged in the first degree.

On that basis, the Court is gonna [sic] adjudicate him a law violator under [HRS § 571–11(1)] based on my review of the substantial and credible evidence before the Court.

On October 2, 2002, the court entered its Decree Re: Law Violation Petitions, that states, in relevant part, as follows:

After full consideration of the admitted evidence the Court finds that the material allegations of the petition(s) have been proved beyond a reasonable doubt and that the minor is a law violator within the purview of HRS Section 571–11(1).

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. The minor is continued on probation until the further order of the court.

 a. The minor's committment [sic] to the care and custody of the Executive Director of the Office of Youth Services for a period of one (1) year as ordered on July 11, 2002 is continued. No release is authorized without court permission.

 b. The minor shall write a letter of apology to the victim with the assistance of his counsel and submit it to the court officer within 14 days of this hearing.

 c. The minor shall remain away from and have no contact with Dominic Perreira.

 d. The minor shall remain away from and have no contact with Sharmain Pedro.

2. The minor/parent(s) shall make restitution in the sum of $665.00, payable in monthly installments of no less than $100.00 beginning November 25, 2002. The minor's parent(s) are made a party for the purposes of restitution.

 . . . .

4. The minor and his parents shall cooperate with [the Department of Education], all services, and any recommended treatment with [sic] until clinically discharged.

On October 21, 2002, Doe filed a Motion for Reconsideration of Adjudication. In the Declaration of Counsel attached to the motion, Doe's counsel argued the following:

4. Errors occurred during the trial some of which are listed below:

 a. First, the suppression of the identification of the minor was not accomplished before trial as required, and was done so, over the objection of the defense;

 b. Second, insufficient evidence was presented at trial to meet the requirement of proof beyond a reasonable doubt[.]

At a hearing on December 12, 2002, Doe argued that, consistent with Hawai'i Rules of Penal Procedure (HRPP) Rule 12(e) (2004), "the motion to suppress must be decided prior to the commencement of trial unless stipulated by all the parties." The State responded that "[t]he Rules of Penal Procedure clearly don't apply to 571–11 hearings, which is what this was. . . . Juvenile proceedings are specifically exempted." At the conclusion of the hearing, the court orally ruled as follows:

Based on the arguments before the Court and based further on the Court's careful reading of both the submittals of the defense and the verbal arguments of the State, based further on the Court's review of [HRPP] sections 54(a) and 54(b), as well as the further case citations, specifically by the defense, I believe it was *State v. Thomas*, which was 72 Haw. 48, 805 P.2d

1212, and further the citation by the State of Hawai'i to *In re Doe,* an [Intermediate Court of Appeals] opinion at 79 Hawai'i 265, 900 P.2d 1332, the Court will hereby deny the motion for reconsideration based on the current state of the law as this Court understands it to be. Specifically, that the Rules of Penal Procedure clearly exclude juvenile proceedings held pursuant to Chapter 571–11, and in this case it's quite clear that those procedures do not govern the procedures within the family court.

At this time the ruling of the Court shall stand as to the adjudication of the minor.

On January 22, 2003, the court entered the following written Findings of Fact and Conclusions of Law and Order Denying Motion for Reconsideration:

1. A Petition was filed in the family court March 13, 2002 charging the minor with committing the offense of Robbery in the Second Degree under police report number 02–092338;

2. The State also filed a Petition for Waiver of Jurisdiction which, after a full investigation and hearing, was denied on June 13, 2002 by the Honorable Frances Q.F. Wong and the matter was set for an adjudication hearing;

3. The minor filed a Motion to Suppress Identification of Minor on July 19, 2002, seeking to suppress all pre-trial identification, including the photographic line-up, and was based upon Rules 12 and 47, [HRPP];

4. State filed a Memorandum in Opposition To Minor's Motion to Suppress Evidence on October 2, 2002;

5. Trial was held on October 2, 2002 and the minor was adjudicated to be a law violator;

6. The Court finds that, based upon their demeanor and manner of testifying, the testimony of the State's witnesses, in particular, Ms. Sharmain Pedro, to be credible;

7. The court did not hold a separate hearing on the motion to suppress but, upon request by the State, consolidated the motion with the trial over the objection of defense;

8. The State did not offer any evidence or testimony as to a photographic line-up;

9. The Court denied, after argument, defense's motion to suppress the identification of the minor by the complaining witness, Sharmain Pedro;

10. Rule 54(a), [HRPP] states that the Rules of Penal Procedure apply to all penal proceedings except as provided in Rule 54(b), which specifically exempts [HRS] section 571–11 juvenile proceedings;

11. There is no applicable Rule of Family Court which mandates a separate hearing on a motion to suppress identification;

12. *State v. Thomas,* 72 Haw. 48, 805 P.2d 1212 (1991) is neither applicable nor controlling;

IT IS THEREFORE ORDERED that the Motion for Reconsideration of Adjudication filed October 21, 2002 is hereby denied.

A notice of appeal was filed on January 9, 2003. This appeal was assigned to this court on September 2, 2003.

## II.

## STANDARDS OF REVIEW

### A.

#### Findings of Fact

"A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Locquiao,* 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (citation omitted).

### B.

#### Questions or Conclusions of Law

Questions or conclusions of law are answered or reviewed upon appeal under the

right/wrong standard of review. *Maile Sky Court Co., Ltd. v. City & County of Honolulu,* 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997).

### C.

#### Abuse of Discretion—Family Court

When reviewing family court decisions for an abuse of discretion, it is well established that

the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

*In re Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994) (internal quotation marks, citations, brackets, and ellipsis omitted).

### D.

#### Questions of Constitutional Law

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. Thus, we review questions of constitutional law under the 'right/wrong' standard." *In re Doe,* 104 Hawai'i 403, 405, 91 P.3d 485, 487 (2004) (ellipsis omitted) (quoting *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000)).

### E.

#### Sufficiency of the Evidence

We review the sufficiency of evidence on appeal as follows:

Evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was

substantial evidence to support the conclusion of the trier of fact.

*State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (brackets omitted) (quoting *State v. Quitog,* 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Richie,* 88 Hawai'i at 33, 960 P.2d at 1241 (citation omitted).

### III.

### DISCUSSION

### A.

#### Applicable Law

Doe contends that the court "erred in denying Doe's motion to hear his motion to suppress prior to trial and in consolidating the taking of evidence on the motion to suppress with the trial testimony." Doe argues that (1) the family court erroneously consolidated the hearing on the motion to suppress identification with the trial, in violation of HRPP Rule 12(e); and (2) even assuming HRPP Rule 12(e) was not applicable to this case, consolidating the hearing on the motion with the trial violated "the essentials of due process and fair treatment."

1. Non-applicability of HRPP Rule 12(e)

HRPP Rule 12(e)(2004) states as follows:

**Ruling on motion.** A motion made before trial shall be determined before trial unless the court orders that it be deferred for determination at the trial of the general issue or until after verdict; provided that a motion to suppress made before trial shall be determined before trial. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

HRPP Rule 54(b) (2004) states, "These rules shall not apply to ... family court proceedings under section 571-11 of [HRS][.]" Doe argues that "even if the HRPP did not specifically apply in this case, the principles

behind the rule still could mandate use of the same procedure."

In *Doe*, the minor objected to the use of HRPP rules in HRS § 571–11 proceedings, including a consolidation of the petitions charging the minor and his brother for the same incident, as well as the use of HRPP Rules 8, 12, 13, and 14. *In re Doe*, 79 Hawai'i 265, 269–70, 900 P.2d 1332, 1336–37 (App.1995). This court decided,

> The HRPP do not apply to HRS § 571–11(1) proceedings. HRPP Rule 54(b). However, in the absence of comparable rules in the Hawai'i Family Court Rules (HFCR), this court has approved of the use of HRPP rules in HRS chapter 571 proceedings. *In re Doe*, 3 Haw.App. 325, 650 P.2d 603 (1982). Although this court acknowledged that the HFCR "do not contain a rule similar to Rule 29, HRPP (1977)," it nevertheless stated that "an accused in family court proceedings under HRS § 571–11(1) has the same right to move for a judgment of acquittal as does an accused in a proceeding to which Rule 29, HRPP, is applicable." *Id.* at 326 n. 1, 650 P.2d at 605 n. 1. It was also held, in connection with another HRPP rule, that "the thought behind ... Rule 7(c) of the Hawaii [Hawai'i] Rules of Penal Procedure (1977) which states that '[f]ormal defects [in the charge] ..., shall not be ground for dismissal of the charge or for reversal of a conviction if the defect did not mislead the defendant to his prejudice' applies in family court situations." *Id.* at 329, 650 P.2d at 607. While HRS § 571–11(1) proceedings are not criminal cases, they are treated, in many respects, like criminal cases where necessary and appropriate. "[A] hearing to determine delinquency need not 'conform with all of the requirements of a criminal trial[;]' but ... the procedures employed 'must measure up to the essentials of due process and fair treatment.'" *In re Doe*, 70 Haw. 32, 761 P.2d 299 (1988) (quoting *In re Gault*, 387 U.S. 1, 30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967) (internal quotation marks and citation omitted)). For example, on appeal, HRS § 571–11(1) proceedings are subjected to the substantial evidence standard applied to appeals from criminal convictions. *See*

*Doe*, 3 Haw.App. at 332, 650 P.2d at 608. The rules of evidence in criminal cases apply to HRS § 571–11(1) proceedings, and evidence which violates "the child's rights secured under the constitution of the United States or the State of Hawaii [Hawai'i]" may not be admitted. HRS § 571–41(c) (1985). The court and the parties here treated these proceedings similarly, not questioning the relevance of HRPP Rules 8, 12, 13, and 14.

> Accordingly, we conclude that no reversible error is committed where the family court employs rules from the HRPP in adjudicating HRS § 571–11(1) proceedings, if the otherwise correct use of such rules does not conflict with the judicial administration of HRS chapter 571 and is not unfairly prejudicial to the minor(s) involved. We indicate only that where the court and/or the parties have availed themselves of the HRPP, each case must be examined separately. Hence, we discuss HRPP Rules 8, 12, 13, and 14 because of their relevance to these proceedings.

(Brackets in original.) *Doe*, 79 Hawai'i at 272, 900 P.2d at 1339. Clearly, although *Doe* permits, it does not mandate, the use of HRPP rules in HRS § 571–11 proceedings.

### 2. Due Process and Fair Treatment

■ Citing *Doe's* requirement that "the procedures employed 'must measure up to the essentials of due process and fair treatment[,]'" in the instant case, Doe contends that his right to due process was violated when his motion to suppress was heard at trial, rather than pre-trial. In support of his contention, Doe argues the following:

> First, if the court had held the motion to suppress [hearing] prior to trial, Doe would have been able to testify at the motion to suppress [hearing] without compromising his Fifth Amendment right not to testify at trial. By consolidating the evidence on both, Doe was forced to choose between testifying to challenge the impermissibly suggestive show-up and giving up his Fifth Amendment right not to testify at trial.

> Second, had the motion to suppress been properly heard prior to trial, Doe could

have used the evidence adduced at that hearing to impeach witnesses at trial, to determine whether or not it would be necessary for him to testify at trial, and to determine whether it would be necessary to conduct further discovery or investigation or to call other witnesses.

Third, by consolidating the motion and the trial, the court utilized the totality of the evidence in ruling on the motion to suppress, not just the evidence that would have been adduced at a motion to suppress [hearing].

(Citation omitted.) Doe's arguments are not persuasive.

It has been said that the purpose behind the HRPP Rule 12(e) requirement that a hearing on a motion to suppress be held prior to trial is to allow the State to appeal an adverse ruling on a motion to suppress.[3] In *State v. Doyle,* 64 Haw. 229, 638 P.2d 332 (1981), the Hawai'i Supreme Court explained:

Rule 12(e) of the Hawaii Rules of Penal Procedure expressly provides that "a motion to suppress made before trial shall be determined before trial." The reason given ... is to provide the prosecution with the opportunity, prior to trial ... to appeal a ruling on the defendant's motion to suppress which is adverse to the State.

64 Haw. at 231, 638 P.2d at 334 (footnote omitted).

The following quote describes an additional purpose:

The rule adopted by the courts below does not merely impose upon a defendant a condition which may deter him from asserting a Fourth Amendment objection—it imposes a condition of a kind to which this Court has always been peculiarly sensitive. For a defendant who wishes to establish standing must do so at the risk that the words which he utters may later be used to incriminate him. Those courts which have allowed the admission of testimony given to establish standing have reasoned that there is no violation of the Fifth Amendment's Self–Incrimination Clause because the testimony was voluntary. As

an abstract matter, this may well be true. A defendant is 'compelled' to testify in support of a motion to suppress only in the sense that if he refrains from testifying he will have to forego a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit. However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit. When this assumption is applied to a situation in which the 'benefit' to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

*Simmons v. United States,* 390 U.S. 377, 393–94, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968) (footnotes omitted).

■ Doe contends that the family court's consolidation of the hearing on the motion and the trial impaired his abilities (a) to use evidence adduced at the pre-trial hearing to impeach witnesses at trial, (b) to determine whether or not it would be necessary for him to testify at trial, and (c) to determine whether it would be necessary to conduct further discovery or investigation or to call other witnesses. As noted above, the requirements are that "the procedures employed 'must measure up to the essentials of due process and fair treatment[,]'" must not "conflict with the judicial administration of HRS Chapter 571[,]" and must not be "unfairly prejudicial to the minor(s) involved."

---

**3.** By contrast, the Federal Rules of Criminal Procedure provide that "[t]he court must rule on a pretrial motion before trial if deferral would adversely affect a party's right to appeal." 1A Wright, Federal Practice and Procedure: Criminal 3d § 194 at 364 (1999).

Doe does not offer, and we do not have, any basis for concluding that the impairments alleged by him violate one or more of these requirements.

■■■ Doe contends (a) that "if the court had held the motion to suppress [hearing] prior to trial, Doe would have been able to testify at the motion to suppress [hearing] without compromising his Fifth Amendment right not to testify at trial[,]" and (b) that in consolidating the hearing on the motion with the trial, the family court considered the totality of the evidence presented when it ruled on his motion to suppress, rather than just the evidence that would have been adduced at a pre-trial hearing. We conclude that Doe could have, but did not, solve the *Simmons* dilemma and his problem by taking advantage of the precedent that "where a case is tried without a jury, it is presumed that the presiding judge will have disregarded the incompetent evidence and relied upon that which was competent." *State v. Antone*, 62 Haw. 346, 355, 615 P.2d 101, 108 (1980). In other words, Doe could have advised the court that he would testify only with respect to issues presented by his motion to suppress, that he was not giving up his Fifth Amendment right not to testify at trial, and that absent his consent, the court must not consider his testimony when deciding the merits of the case. On appeal, Doe cannot complain of the harm, if any, he suffered as a result of his failure to do this.

## B.

### Reliability of Identification Procedures

■■■ Doe contends that "[t]he court erred in denying Doe's motion to suppress where the show-up procedure used by the police was impermissibly suggestive and Pedro's identification, considering the totality of the circumstances, was not sufficiently reliable."

When the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pretrial identification procedure, he or she has the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly

or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, and the elapsed time, the witness's identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury.

*State v. Okumura*, 78 Hawai'i 383, 391, 894 P.2d 80, 88 (1995) (brackets omitted) (quoting *State v. DeCenso*, 5 Haw.App. 127, 131, 681 P.2d 573, 577–78 (1984)). "[Q]uestions of suggestiveness and reliability are questions of law that are freely reviewable on appeal." *Id.* On the other hand, answering these questions involves determinations of fact by the court. *Id.* at 392, 894 P.2d at 89. "Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the 'clearly erroneous' standard." *Id.* (quoting *State v. Blake*, 5 Haw.App. 411, 414, 695 P.2d 336, 338 (1985)).

■■■ Pedro identified Doe in two instances. The first identification occurred while Pedro was in the ambulance after the attack. Doe argues that the field show-up procedure which occurred at this time was impermissibly suggestive because the show-up procedure "consisted of handcuffing Doe, flanking him with a uniformed police officer, putting him essentially on center-stage and spotlighting him with the headlights from the police vehicles and then having Pedro drive up in the ambulance to identify him." The State agrees that this procedure was impermissibly suggestive.

■■■ Doe must also prove that based on the totality of the circumstances, Pedro's identification was not sufficiently reliable. Doe argues that based on the totality of the circumstances, Pedro's identification of Doe at the show-up was not sufficiently reliable because: (1) Pedro only had brief glances of Doe; (2) Pedro's attention was primarily focused on the taller male; (3) the accuracy of Pedro's description of the criminal is in doubt because she insisted the shorter male was wearing a beige or tan shirt, and Doe was arrested wearing a red shirt; (4) Officer Bugarin described Pedro as appearing "dazed and confused" at the time of the

show-up; and (5) there was a long length of time between the crime and the time that Pedro identified Doe as the assailant.

### 1. Pedro had Ample Time to View Doe

Doe's arguments (1) and (2) above are without merit. Pedro testified that she first noticed Doe and the larger male when she turned behind her after hearing footsteps. Pedro turned around again when they were about fifteen feet away from her. The third time she turned around was when they were five feet away from her. Pedro testified that there were street lights and that she could see their faces. In addition, while the older male was talking to her, Doe stood directly in her face and blocked her way.

### 2. Pedro's Description of Doe

Doe's argument (3) above is without merit. When Pedro originally saw the two males, the taller male was "wearing a white shirt, and the blue jeans and some tennis shoes" and the other male "was wearing a beige shirt and, um, some windbreaker pants and slippers." Pedro also stated that Doe was wearing a necklace outside of his shirt. At the time of the identification procedure, Doe was "wearing a red shirt[.]" However, when the officer lifted Doe's shirt, there was a white t-shirt and "the same necklace" underneath.

### 3. Pedro's Level of Certainty in Identifying Doe

In argument (4) above, Doe argues the following:

[I]mmediately before the show-up, [Officer] Bugarin described Pedro as appearing "dazed and confused" and she was on medication at the time and had been just hit in the head and possibly been unconscious for almost an hour. Therefore, it is probable that any certainty she exhibited was due to the impermissibly suggestive procedure used by the police, not due to her own independent recollection.

We conclude that Doe's argument suggesting that Pedro was unable to affirmatively identify Doe as the assailant is without merit. Officer Bugarin testified on cross-examination at trial, in relevant part, as follows:

Q Okay. And it was your observation, correct, that she appeared dazed and confused?

A Oh, yes.

Q You say, "oh, yes." Was that pretty clear to you?

A Yes.

. . . .

Q . . . Did you observe any physical problems with her other than her injuries?

A Um, she just had that gash on her face.

Q Okay. You didn't see any signs of being intoxicated or under the influence of any substances; correct?

A No.

No evidence was introduced suggesting that the medication taken by Pedro earlier in the day impacted Pedro's ability to identify Doe.

### 4. Length of Time Between the Crime and Identification

In argument (5) above, Doe argues that "at least two hours had elapsed between the time of the incident and the show-up . . ., rendering Pedro's identification further suspect." Pedro testified that soon after the incident, she closed her eyes because she felt dizzy. She stated that it was not too long before people walked by and gave her assistance. The police and an ambulance arrived soon after. The paramedics examined her and put an ice pack on her face. While she was undergoing treatment, Officer Bugarin interviewed her and asked for a description of the suspects. Later, on the way to the hospital, the ambulance stopped at Jefferson Elementary School where Pedro was asked to sit up to look at a male person to see if that male person was one of the two who robbed her. It appears that the amount of time between the attack and the time that Pedro identified Doe at the show-up was approximately two hours. There is no bright line indicating what length of time would render the identification suspect. However, a period as brief as two hours does not appear to be "particularly significant[.]" *Okumura*, 78 Hawai'i at 393, 894 P.2d at 90 (concluding that an eight-week period of time between the commission

of the crime and the time of identification was "neither so short as to favor reliability nor too long to raise any serious doubts"); *see State v. Araki,* 82 Hawai'i 474, 485–86, 923 P.2d 891, 902–03 (1996) (seven-week period and same conclusion). Therefore, we conclude that this contention is also without merit.

## C.

### Doe's Use of a Dangerous Instrument

 Doe argues that he could not be convicted as an accomplice to Robbery in the First Degree because "there was no evidence that Doe (or the shorter male) used any objects during the robbery[.]" HRS § 708–840 (1993 and Supp.2003) states, in relevant part, as follows:

> **Robbery in the first degree.** (1) A person commits the offense of robbery in the first degree if, in the course of committing theft:
>
> (a) The person attempts to kill another, or intentionally or knowingly inflicts or attempts to inflict serious bodily injury upon another; or
>
> (b) The person is armed with a dangerous instrument and:
>
> (i) The person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance; or
>
> (ii) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.
>
> (2) As used in this section, "dangerous instrument" means any firearm, whether loaded or not, and whether operable or not, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury.
>
> (3) Robbery in the first degree is a class A felony.

HRS § 707–700 (1993) states, " 'Serious bodily injury' means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

Pedro described the weapon as a "little black stick" which stuck out "about three inches out of [the assailant's] hand." Pedro stated that she could not see what was on the other end of the stick, but "felt something strike [her] face [and she] kinda went down and it started burning...." Pedro testified that after the assailants ran away, there was "blood that was running into [her] mouth." She also felt dizzy and so she laid down at a bus stop. Once the ambulance came, Pedro's wounds were attended to and eventually stitched up.

The question is whether there is substantial evidence that the manner in which the "little black stick" was used was capable of producing serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. The answer is yes.

## CONCLUSION

Accordingly, we affirm the family court's (1) October 2, 2002 Decree Re: Law Violation Petitions and (2) the January 22, 2003 Findings of Fact and Conclusions of Law and Order Denying Motion for Reconsideration.

