**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000727
11-DEC-2020
07:57 AM
Dkt. 76 MO**

NO. CAAP-17-0000727

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee, v.
RALPH CURTIS RIVEIRA, JR., also known as
RALPH C. RIVEIRA, JR. Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1PC121001439)

MEMORANDUM OPINION
(By: Ginoza, C.J., and Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Ralph Curtis Riveira, Jr., also known as Ralph C. Riveira, Jr. (**Riveira**), appeals from the Judgment of Conviction and Sentence (**Judgment**), entered on September 26, 2017, in the Circuit Court of the First Circuit (**circuit court**).[1/] After a jury trial, Riveira was convicted of Burglary in the First Degree, in violation of Hawaii Revised Statutes (**HRS**) § 708-810(1)(c) (1993).[2/]

---

[1/]    The Honorable Rom A. Trader presided.

[2/]    HRS 708-810(1)(c) provides:

   (1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

      . . .

      (c)   The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

On appeal, Riveira contends that the circuit court erred in:  (1) denying his motion to suppress, and admitting into evidence, the field "show-up" identifications of Riveira made by two witnesses; (2) admitting into evidence certain photographs of Riveira; (3) permitting the State to adduce "victim impact testimony" during trial; (4) instructing the jury on accomplice liability; and (5) permitting the State to engage in prosecutorial misconduct during closing and rebuttal arguments.

For the reasons set forth below, we affirm the Judgment.

## I.  Background

At 12:47 p.m. on February 17, 2012, Jayme Watanabe (**Jayme**) was pulling into her driveway with her children, when she noticed a maroon Toyota Tundra pickup truck parked in front of her home and several family belongings in the driveway.  At that time, Jayme also observed a male running up the slope of her backyard and jumping over a fence.  After the male jumped over the fence, Jayme called 911 and provided a description of the male and related that he was carrying a black electronic device. Jayme then approached the truck and gave the dispatcher a description of the truck, its license plate, and the female inside, who she described as having feet with painted toenails on the dashboard.  The truck drove away soon after.

Police arrived at Jayme's home about five to ten minutes after she called 911.  While looking through her home with police, Jayme noticed that a black Toshiba laptop and three Nintendo gaming devices were missing.

At around 12:55 p.m. on the same day, police stopped a truck matching the description Jayme gave to the 911 dispatcher. The truck contained a female driver and male passenger.  Police identified the female driver as Denise K. Bunao (**Bunao**) and the male passenger as Riveira.  Police informed Jayme that they had stopped possible suspects and asked Jayme if she would be willing to identify them.  Officer Kapuanani Zuttermeister (**Officer Zuttermeister**) of the Honolulu Police Department drove Jayme about a mile from Jayme's home to where police had stopped the

possible suspects. As they drove by the scene, Jayme identified the truck and the male and female as being the same ones she observed at or near her home. After participating in the field show-up, Jayme filled out a written description form. Jayme described the person she saw running from her backyard as a Polynesian male in his thirties with a brown complexion; 5'6" to 6'0" in height; heavy build, 200 to 220 pounds; black, afro/shaved, crew cut hair; green shirt; plaid cotton shorts; and boots.

At around 1:30 p.m., Jayme's neighbor, Orlando Pagaduan, Jr. (**Pagaduan**), noticed the police at Jayme's house and went over to see what had happened. While talking to the police, Pagaduan related that he had seen the truck earlier and got a good visual of the driver. While Pagaduan was driving home at around 12:35 p.m., he passed a male sitting alone in the driver's seat of a red Toyota Tundra pickup truck parked on a street near their homes. Pagaduan saw the truck again at 12:40 p.m. driving down his and Jayme's street. The police asked Pagaduan to accompany them to the scene where they had stopped the possible suspects to see if he could identify the man he saw. An officer drove Pagaduan past the scene, separately from Jayme, where he identified Riveira. After participating in the field show-up, Pagaduan filled out a written description form. Pagaduan described the person he saw in the truck as a Caucasian male in his thirties with a fair complexion; 5'4" to 5'6" in height; heavy build, 200 to 220 pounds; short, brown, wavy hair; brown facial hair with a goatee; tattoos; sunglasses and a black cap; bright yellow short-sleeved t-shirt; and plaid knit medium-length pants.

On February 24, 2012, police executed a warrant to search the Toyota Tundra in which Riveira and Bunao had been apprehended. While conducting the search, police recovered a black Toshiba laptop and three Nintendo gaming devices. That same day, Jayme was able to identify the items as belonging to her family.

On September 28, 2012, Riveira was charged with one count of Burglary in the First Degree.

On March 11, 2013, Riveira filed a Motion to Suppress Identification (**Motion to Suppress**), by which he sought to suppress the eyewitness identifications of him made by Jayme and Pagaduan. Riveira argued that: (1) the field show-up procedure used by police in obtaining the identifications of Riveira was impermissibly and unnecessarily suggestive, and (2) Jayme's and Pagaduan's identifications of Riveira were unreliable. Plaintiff-Appellee State of Hawaiʻi (**State**) responded that although the field show-up procedure used by police may have been impermissibly suggestive, based on the totality of the circumstances, Jayme's and Pagaduan's identifications of Riveira were nonetheless reliable. Jayme, Pagaduan, and Officer Zuttermeister testified at the September 3, 2013 hearing on the Motion to Suppress.

On September 25, 2013, the circuit court entered its written "Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Suppress Identification" (**Order Denying Motion to Suppress**). The circuit court agreed that the field show-up procedure was impermissibly suggestive, but held that both Jayme's and Pagaduan's identifications of Riveira were nonetheless reliable.

On October 15, 2013, Riveira filed Defendant's First Motion in Limine, which sought to exclude, *inter alia*: (1) a photograph of Riveira that police recovered from a "brown zippered nylon pouch" (also described as a "beach bag") that belonged to Bunao and was discovered in the Toyota Tundra truck, because the photograph was irrelevant or unfairly prejudicial; (2) photographs taken of Riveira after he was arrested on February 17, 2012, because they were irrelevant or unfairly prejudicial; and (3) Jayme's identification of Riveira as the suspect to Officer Zuttermeister, because it was hearsay. The circuit court orally held that it would preliminarily exclude the photograph found in the bag, noting that it would reopen the matter if the connection between Riveira and Bunao was raised as an issue at trial by the defense. The circuit court also denied Riveira's request to exclude the photographs taken of Riveira after his arrest and Jayme's identification of Riveira to Officer

Zuttermeister.

The jury trial took place on October 21, 23, and 24, 2013. Various witnesses testified for the State, including Jayme and Ryan (**Ryan**) Watanabe, Officer Norman Padilla (**Officer Padilla**), and Detective Michael Choy (**Detective Choy**). During the trial, the circuit court determined that Riveira opened the door to revisiting the admissibility of the photograph found in the bag. After a conference with the parties outside the presence of the jury, the circuit court determined that the photograph was admissible. After the presentation of the evidence concluded, the circuit court gave the jury instructions, which included, *inter alia*, the elements of Burglary in the First Degree and accomplice liability. The jury found Riveira guilty as charged, and the circuit court convicted him of one count of Burglary in the First Degree.

## II.  Points of Error

On appeal, Riveira contends that the circuit court erred by:  (1) denying his Motion to Suppress and admitting the field show-up identifications made by Jayme and Pagaduan; (2) admitting a full-body arrest photograph of Riveira; (3) admitting the photograph of Riveira that was found in the truck associated with the alleged crime; (4) permitting the State to adduce testimony from the complaining witnesses, Jayme and Ryan, regarding the impact the alleged burglary had on them; (5) instructing the jury on accomplice liability; and (6) permitting the State to engage in prosecutorial misconduct during closing and rebuttal arguments. Riveira further contends that the cumulative effect of some or all of these errors warrants reversal of the Judgment.[3]

## III. Standards of Review
### A.  Motion to Suppress Eyewitness Identification

With respect to whether an eyewitness identification should be suppressed, we have held that "questions of suggestiveness and reliability are questions of law that are freely reviewable on appeal." State v. Okumura, 78 Hawaiʻi

---

[3]    Riveira's points of error have been restated and condensed for clarity.

> 383, 391, 894 P.2d 80, 88 (1995), abrogated on other grounds by [State v. ]Cabagbag, 127 Hawaiʻi [302,] 315, 277 P.3d [1027,] 1040 [(2012)]. However, "answering these questions involves determinations of fact by the trial court." 78 Hawaiʻi at 392, 894 P.2d at 89. "Factual determinations made by the trial court deciding pretrial motions in a criminal case are governed by the clearly erroneous standard," and "conclusions of law are reviewed under the right/wrong standard." State v. Edwards, 96 Hawaiʻi 224, 231, 30 P.3d 238, 245 (2001) (quoting State v. Eleneki, 92 Hawaiʻi 562, 564, 993 P.2d 1191, 1193 (2000)).

State v. Kaneaiakala, 145 Hawaiʻi 231, 240, 450 P.3d 761, 770 (2019) (original brackets omitted).

## B.    Admissibility of Evidence

> As a general rule, [the appellate] court reviews evidentiary rulings for abuse of discretion. Kealoha v. County of Hawaiʻi, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993). However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under Hawaiʻi Rules of Evidence (HRE) Rules 401 and 402, [the appellate] court applies the right/wrong standard of review. Id. at 319, 844 P.2d at 676; State v. White, 92 Hawaiʻi 192, 204-05, 990 P.2d 90, 102-03 (1999).

Moyle v. Y & Y Hyup Shin, Corp., 118 Hawaiʻi 385, 391, 191 P.3d 1062, 1068 (2008) (original brackets omitted) (quoting Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 104, 176 P.3d 91, 103 (2008)).

## C.    Prosecutorial Misconduct

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Rogan, 91 Hawaiʻi 405, 412, 984 P.2d 1231, 1238 (1999) (quoting State v. Balisbisana, 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996)) (internal quotation marks omitted).

## D.    Jury Instructions

> "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading."

> "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial."

> Error is not to be viewed in isolation and considered purely in the abstract.  It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.  In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

State v. Cullen, 86 Hawaiʻi 1, 8, 946 P.2d 955, 962 (1997) (citations and brackets omitted; block quote format altered) (quoting State v. Arceo, 84 Hawaiʻi 1, 11-12, 928 P.2d 843, 853-53 (1996)) .

## IV.  Discussion

### A.  Field Show-up Identifications

In his first point of error, Riveira argues that the circuit court erred in denying his Motion to Suppress because the field show-up identifications by Jayme and Pagaduan were both impermissibly suggestive and unreliable.

The circuit court concluded that the field show-up procedure was impermissibly suggestive, and the State concedes this point.  See State v. Cabinatan, 132 Hawaiʻi 63, 76, 319 P.3d 1071, 1084 (2014) ("While show-ups are permissible, they are inherently suggestive." (brackets omitted) (citing State v. DeCenso, 5 Haw. App. 127, 131, 681 P.2d 573, 578 (1984))).  Accordingly, we must decide whether the field show-up identifications made by Jayme and Pagaduan, though obtained through an impermissibly suggestive procedure, were nonetheless reliable under the circumstances.  In reviewing the denial of a motion to suppress, we look at both the record of the hearing on the motion to suppress and the record of the trial.  State v. Vinuya, 96 Hawaiʻi 472, 481, 32 P.3d 116, 125 (App. 2001).

In State v. Padilla, 57 Haw. 150, 154, 552 P.2d 357, 360 (1976), abrogated on other grounds by State v. Cabagbag, 127 Hawaiʻi 302, 277 P.3d 1027 (2012), and prospectively overruled by Kaneaiakala, 145 Hawaiʻi 231, 450 P.3d 761, the supreme court adopted a totality-of-the-circumstances approach to determine whether an eyewitness identification procured through an impermissibly suggestive procedure is nonetheless sufficiently reliable to be admissible in evidence.  In making its determination, the trial court must consider the following

7

factors: (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the identification. Padilla, 57 Haw. at 154, 552 P.2d at 360 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)). "As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification." DeCenso, 5 Haw. App. at 132, 681 P.2d at 578 (citing Manson v. Brathwaite, 432 U.S. 98 (1977)).

We recognize that the Hawaiʻi Supreme Court recently overruled Padilla's five-factor test and established new rules for determining the admissibility of eyewitness identification in Kaneaiakala, 145 Hawaiʻi at 234-36, 450 P.3d at 764-66. However, the supreme court expressly stated in Kaneaiakala that its holdings apply only prospectively, and, here, the circuit court made its admissibility determinations before the Kaneaiakala opinion was issued. Accordingly, we consider the circuit court's rulings under Padilla, which was the governing case law at the time of the rulings. See Kaneaiakala, 145 Hawaiʻi at 235-36, 450 P.3d at 765-66 (stating that the court's newly-established rules have prospective-only effect and that the trial court did not err in applying the Padilla factors in its admissibility determination at the time it was made). Based on the prospective-only effect of the supreme court's decision in Kaneaiakala, we reject Riveira's proposal to disregard the witnesses' degrees of certainty in identifying a suspect, and to instead consider the degree to which the police's use of a suggestive procedure tainted the witnesses' identification.

### 1. Pagaduan

Riveira asserts that, under the totality of the circumstances, Pagaduan's identification was unreliable because: (1) Pagaduan had only a fleeting opportunity to view Riveira as Pagaduan drove past Riveira sitting in a parked truck; (2) Pagaduan's attention was slight; (3) Pagaduan's descriptions of

the suspect before and after the field show-up were inconsistent with his identification of Riveira, because Riveira was not wearing a construction shirt, a hat, or sunglasses during the field show-up; and (4) at the hearing on the Motion to Suppress, Pagaduan indicated that he relied on Riveira's tattoos to identify him, but at trial, Pagaduan "prevaricated" on whether the tattoos "had anything to do with" Pagaduan's ability to identify Riveira. Riveira challenges the circuit court's findings of fact (**FOFs**) 2 and 16,[4] and conclusions of law (**COLs**) 14 and 15[5] in the Order Denying Motion to Suppress.

At both the hearing on the Motion to Suppress and at trial, Pagaduan testified that on February 17, 2012, he passed a man in a red Toyota Tundra extra cab, whom he later identified as Riveira, on a brightly lit afternoon with an unobstructed view from about twenty feet away. Pagaduan further stated that during the ten seconds he was passing the man and the truck, his attention was drawn to the truck because it was parked opposite of traffic over a storm drain, and to the man, whom he did not recognize, because the man gave Pagaduan a "shaka" as Pagaduan passed. Pagaduan also testified that during the time he passed the suspect, he observed the man's tattoos, short hair, and yellow construction shirt. Pagaduan stated he saw the truck pass him about five minutes later. Such testimony establishes that Pagaduan's opportunity to view the suspect was not fleeting; nor was his attention slight. FOF 2 is not clearly erroneous.

---

[4] FOF 2 states: "At the time Mr. Pagaduan observed this male the following conditions existed: (a) the lighting conditions were daytime; (b) his view was unobstructed and (c) his attention was focused on this unfamiliar male in his neighborhood."

FOF 16 states: "As a HPD Officer drove Mr. Pagaduan past Defendant, Mr. Pagaduan positively identified Defendant as the man he saw at approximately 12:35 p.m. parked in his neighborhood. Mr. Pagaduan made his identification based on the Defendant's short brown hair and tattoos."

[5] COL 14 states: "Under the totality of the circumstances, the pretrial identification of Defendant by Mr. Pagaduan on February 17, 2012, was nevertheless reliable and worthy of consideration by a jury."

COL 15 states: "There is not a substantial likelihood of misidentification in the pretrial identification of Defendant by Mr. Pagaduan on February 17, 2012."

Pagaduan testified at both the hearing on the Motion to Suppress and at trial that about two hours elapsed between the time he first observed the suspect and when he participated in the field show-up. The two-hour time period is not particularly significant and does not render Pagaduan's identification suspect. See, e.g., State v. Araki, 82 Hawaiʻi 474, 485-86, 923 P.2d 891, 902-03 (1996) (concluding that a seven-week period of time between the commission of the crime and the time of identification was "neither so short as to favor reliability nor too long to raise any serious doubts" (quoting Okumura, 78 Hawaiʻi at 393, 894 P.2d at 90 (same conclusion as Araki for an eight-week period), abrogated on other grounds by Cabagbag, 127 Hawaiʻi 302, 277 P.3d 1027)); In re Doe, 107 Hawaiʻi 439, 451, 114 P.3d 945, 957 (App. 2005) (concluding that a period as brief as two hours does not appear to be particularly significant), overruled on other grounds by State v. Chang, 144 Hawaiʻi 535, 445 P.3d 116 (2019).

As to Pagaduan's certainty when identifying Riveira during the field show-up identification, Pagaduan stated during the hearing on the Motion to Suppress that Riveira was a "positive match to the person" he saw, including the tattoos. At trial, Pagaduan stated that he was one hundred percent sure of his identification. FOF 16 is not clearly erroneous.

Riveira's contention that Pagaduan "prevaricated" on whether Riveira's tattoos had anything to do with Pagaduan's ability to identify Riveira misconstrues Pagaduan's testimony. The record indicates that at trial, Pagaduan could not recall whether he had identified Riveira in part by his tattoos. After his recollection was refreshed by reviewing his witness statement, Pagaduan testified that he did identify Riveira in part based on his tattoos. Contrary to Riveira's assertion, Pagaduan did not "prevaricate."

Based on Pagaduan's testimony at trial, it appears that his written suspect description and statement were, at least in regards to the suspect's shorts and sunglasses, a combination of his pre-show-up identification impressions of the suspect and what he observed at the field show-up. Pagaduan also testified

10

that when he identified Riveira at the field show-up, Riveira was not wearing the yellow shirt he saw the man in the truck wearing; Pagaduan could not remember if Riveira was wearing a black cap. Despite the discrepancies between Pagaduan's description of the suspect and his identification of Riveira, based on the Padilla factors and the totality of the circumstances as reflected in the record, the circuit court did not err in denying Riveira's Motion to Suppress as to Pagaduan's pretrial identification. COLs 14 and 15 are supported by the FOFs and the record, and are right.

### 2. Jayme

Riveira asserts that under the totality of the circumstances, Jayme's identification was unreliable because: (1) when she purportedly saw Riveira running from her property, Jayme may have been distracted by the truck, the objects out of place in her driveway, the objects the man was carrying away, concern for her sons, and calling 911; (2) she saw the suspect for only a few seconds and did not see his face; (3) she filled out the written statement and suspect description forms only after the field show-up identification; and (4) at the field show-up, Riveira was not wearing the same shirt Jayme stated the suspect was wearing when Jayme first saw him. Riveira challenges the circuit court's FOFs 7 and 14,[6] and COLs 11 and 12[7] in the circuit court's Order Denying Motion to Suppress.

At the hearing on the Motion to Suppress and at trial, Jayme testified that on February 17, 2012, she was returning home to her residence, when she noticed a maroon Toyota Tundra parked

---

[6] FOF 7 states: "At the time Ms. Watanabe observed this male the following conditions existed: (a) the lighting conditions were daytime; (b) her view was unobstructed and (c) her attention was focused on this unfamiliar male running through her back yard [sic]."

FOF 14 states: "Although Defendant was standing next to the maroon Toyota Tundra with license plate 'RDF486,' at the time of Ms. Watanabe's identification of him, she did not identify him as the male she had seen earlier based on this reason."

[7] COL 11 states: "Under the totality of the circumstances, the pretrial identification of Defendant by Ms. Watanabe on February 17, 2012, was nevertheless reliable and worthy of consideration by a jury."

COL 12 states: "There is not a substantial likelihood of misidentification in the pretrial identification of Defendant by Ms. Watanabe on February 17, 2012."

next to her mailbox and saw a female in the passenger seat with her feet on the dashboard with painted toenails. Jayme further testified she noticed certain family belongings in her carport, and then when she exited her vehicle, she noticed someone running through the back of her yard. Jayme testified she had an unobstructed view of a heavy-set man, between five feet, six inches and six feet tall with short black hair, running from her property and jumping over her fence. Jayme described the man as dressed in a bright "construction green colored" shirt, plaid shorts, and dark construction boots. Jayme further stated that she was about thirty feet from him, it was a clear day, and she observed the suspect for between five and ten seconds. However, Jayme admitted that she did not see the front of his body or face. Although Jayme was unable to see the suspect's face, the record indicates that she otherwise had a good opportunity to view the suspect. Cf. Kaneaiakala, 145 Hawaiʻi at 236-37, 241, 450 P.3d at 766-67, 771 (determining that the circuit court did not clearly err in finding that the witness "got a good look" at the suspect on the day of the incident when she testified that from four meters away she was able to observe the suspect's shirt, complexion, build, and hair, but could only see half of the suspect's face, which was partially covered by a hat).

With respect to Jayme's degree of attention, although she stated that she was concerned by the objects in her driveway that were not in their usual location and for the safety of her children, Jayme testified that she was focused on both the man and the objects he was carrying, and was not distracted by anything else. Further, Jayme testified that she did not call 911 until after the suspect had already jumped over her fence and that it was during the 911 call that she walked over to the truck to convey the license plate number to the 911 operator. FOF 7 is not clearly erroneous.

As to the accuracy of Jayme's prior description of the suspect, Jayme testified at trial that at the field show-up, Riveira "was wearing the same plaid shorts, he had the same build, he had the same shoes. The only thing [that] was different was his shirt; he was not wearing the construction neon

shirt." Instead, Riveira was wearing a white shirt at the field show-up.

Regarding Jayme's certainty of her identification of Riveira at the time of the field show-up identification, she testified at trial that she believed it was the same man based on what he was wearing, his heavy set build, his dark skin, and the female that was with him. Jayme noted that the suspect was not wearing the same shirt during the identification procedure, but she was nonetheless a "hundred percent" certain of her identification at the time. Jayme also testified at the hearing on the Motion to Suppress that she identified Riveira based on the above, and not because he was standing next to the truck she observed in front of her house. Therefore, FOF 14 is not clearly erroneous.

The length of time between the alleged crime and the identification was less than one hour, which is not particularly significant. See, e.g., Araki, 82 Hawaiʻi at 485-86, 923 P.2d at 902-03; Okumura, 78 Hawaiʻi at 393, 894 P.2d at 90; In re Doe, 107 Hawaiʻi at 451, 114 P.3d at 957.

To the extent that we have determined that the field show-up procedure was impermissibly suggestive and that the holding in Kaneaiakala has only prospective effect, we need not address Riveira's contention that Jayme's identification was unreliable on the basis that she filled out the written statement and suspect description forms after the field show-up identification. Nonetheless, Jayme testified that she filled out the forms based on her memory of the suspect in her backyard, not at the field show-up.

Based on the Padilla factors and the totality of the circumstances as reflected in the record, the circuit court did not err in denying Riveira's Motion to Suppress as to Jayme's pretrial identification. COLs 11 and 12 are supported by the FOFs and the record, and are right.

Riveira also argues that Jayme's pretrial identification was hearsay and that the circuit court erred in admitting it as a hearsay exception under HRE Rule 802.1(3)

13

(2009)[8/] or for the purpose of explaining the investigation.  We disagree.

Riveira posits that Jayme's pretrial identification was inadmissible under HRE Rule 802.1(3) because she did not identify "a person," insofar as she did not see the suspect's face, and because the identification procedure was suggestive.

> The plain language of HRE Rule 802.1(3) states that there are only two requirements to admit a prior statement as an exception to the hearsay exclusionary rule for the purposes of identification: (1) the declarant must be subject to cross-examination, and (2) the statement must be one of identification of a person made after perceiving that person.

State v. Tafokitau, 104 Hawaiʻi 285, 291, 88 P.3d 657, 663 (App. 2004).  HRE Rule 802.1(3) does not address the suggestiveness of an identification procedure.

The record evinces that Jayme identified the suspect's build, height, complexion, clothing, and hair after observing the suspect, and Riveira does not point to any authority recognizing these characteristics as insufficient to establish the "identification of a person."  In our view, these characteristics were sufficient.  Cf. Kaneaiakala, 145 Hawaiʻi at 236-37, 241, 450 P.3d at 766-67, 771.  The record also shows that Jayme was available for cross-examination and that her statements of identification were made after she observed the suspect in her backyard.  Therefore, the admission of her pretrial identification complied with the two requirements of HRE Rule 802.1(3).

Further, contrary to Riveira's assertion, the State was permitted to present Jayme's pretrial identification of Riveira as substantive proof of identity.  See State v. Motta, 66 Haw.

---

[8/]     HRE Rule 802.1(3) provides, in relevant part:

> **Rule 802.1  Hearsay exception; prior statements by witnesses**.  The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:
>
> . . .
>
> (3)  Prior identification.  The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, and the statement is one of identification of a person made after perceiving that person[.]

254, 262, 659 P.2d 745, 751 (1983) ("[T]he prior identification exception under Fed. R. Evid. 801(d)(1)(c) (and under Haw. R. Evid. 802.1(3)) allows the admission of pretrial identifications, not merely as corroborative evidence, but also as substantive proof of identity.").

On this record, the circuit court did not err in admitting Jayme's pretrial identification.  See State v. Abrigo, 144 Hawaiʻi 491, 497, 445 P.3d 72, 78 (2019) ("Where the admissibility of evidence is determined by application of the hearsay rule, there can be only one correct result, and the appropriate standard for appellate review is the right/wrong standard." (quoting State v. Moore, 82 Hawaiʻi 202, 217, 921 P.2d 122, 137 (1996) (brackets and internal quotation marks omitted))).

### B.    Victim Impact Testimony

At trial, the State adduced testimony from Ryan and Jayme on direct examination regarding how the alleged burglary left them feeling violated.  Since Riveira did not object during trial, we review for plain error.  See Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 52(b).

Riveira contends that pursuant to HRE Rules 401 and 403, the testimony was irrelevant, and its probative value was substantially outweighed by the danger of unfair prejudice.  The State does not directly rebut Riveira's arguments based on HRE Rules 401 and 403.  Rather, the State posits that a finding of plain error is unwarranted because defense counsel expounded on the testimony complained of during cross-examination and the failure to object was a matter of trial strategy.

On direct examination, the State adduced the following testimony from Ryan:

Q.  Mr. Watanabe, how did it make you feel after you had learned that you had been burglarized?

A.  Violated.  It makes you feel violated.

Q.  Anything beyond that?

A.  No.

The State also adduced the following testimony from Jayme:

Q. Mrs. Watanabe, how did it make you feel having your home burglarized on February 17th, 2012?

A. Very violated. I'm a mother of children, and to have someone in my home, where my children sleep, this person has been in my property, and it's a very personal feeling, and I had a hard time sleeping afterwards. I was very concerned for my safety, for the safety of my family. And to this day I make sure that I put all electronics -- before I leave the home, I make sure I hide them because of -- of this occurrence. So it's affected me deeply.

On cross-examination, defense counsel questioned Jayme as follows:

Q. Like you just testified, it's not a good feeling to go home where you're supposed to be safe and secure, correct?

. . . .

Q. I bet you that even when -- for example, when you hear a noise, you start looking out, right, you start getting a feeling, right, that maybe somebody's here, right?

. . . .

Q. So is it safe to say that sometime [sic] time -- you know, when they say time heals a broken heart, that passage of time actually makes things a little bit better?

. . . .

Q. And passage of time makes you look back and reflect as to what actually happened and makes you have a better sense of what actually occurred; isn't that right?

The testimony from Ryan and Jayme regarding the alleged burglary's impact on them was not relevant, because it did not have a tendency to make it more or less probable that Riveira committed the burglary; nor did it have a bearing on any other fact of consequence. See HRE Rule 401; see also State v. Lora, 147 Hawaiʻi 298, 309 n.14, 465 P.3d 745, 756 n.14 (2020) ("[I]mpact evidence is 'generally considered irrelevant if offered during the guilt phase of a trial unless relevant to a proper purpose, such as to impeach a victim's credibility or establish an element of the crime at issue[.]'" (quoting Kimberly J. Winbush, Admissibility of Victim Impact Evidence in Noncapital State Proceedings, 8 A.L.R. 7th Art. 6 (2016))).

Although the testimony was not relevant, we conclude that its admission did not affect Riveira's substantial rights and therefore did not rise to the level of plain error. In determining whether irrelevant testimony of trial witnesses

16

prejudiced a defendant's substantial rights, we consider the entire record, paying particular attention to:  "the purpose of the testimony, whether the [witnesses] expressed their opinions or characterizations of the crime and the effect of the crime on [them], the strength and weakness of the evidence against the defendant, whether the failure to object to such testimony was the result of trial strategy or ineffective assistance of counsel, and whether and how the testimony was woven into the case."  State v. Uyesugi, 100 Hawaiʻi 442, 460, 60 P.3d 843, 861 (2002); see Lora, 147 Hawaiʻi at 310, 465 P.3d at 757 (applying Uyesugi to determine the prejudicial effect of a complaining witness's erroneously admitted testimony about what it was like to undergo the sexual assault physical examination and what she wished she had done differently around the time of the assault).

As discussed above, Ryan and Jayme testified about the effects of the alleged crime on them.  Such testimony was not relevant to the issues in this case.  However, it appears that defense counsel's failure to object to the testimony was a result of trial strategy, as defense counsel expounded upon Jayme's testimony on cross-examination in an apparent effort to challenge the reliability of her pretrial identification of Riveira. Although the State briefly mentioned in both its opening statement and rebuttal closing argument that the evidence would show and had shown that Ryan and Jayme lost their sense of security, this point was not substantially woven into the case or substantially highlighted in the arguments or on direct examination.  As for evidence linking Riveira to the crime, both Jayme and Pagaduan identified Riveira as the person they had seen, and the police recovered the stolen items from the truck in which Riveira was apprehended.  On balance, these factors support the conclusion that the error in admitting Ryan's and Jayme's testimonies did not affect Riveira's substantial rights.  See Uyesugi, 100 Hawaiʻi at 460-62, 60 P.3d at 861-63.

C.   **Admissibility of Photographs**

Riveira next contends that the circuit court erred in admitting a full-body arrest photograph of Riveira and a

photograph of Riveira that was found in the truck associated with the alleged crime.

### 1.    **Full-body Photograph**

Riveira argues that the circuit court erred in admitting State's Exhibit 17, a full-body photograph of Riveira at the field show-up.  Riveira contends that the State did not have a demonstrable need for the photograph because State's Exhibit 18, a photograph depicting Riveira's head and shoulders on the same day, was sufficient to verify the accuracy of Jayme's prior description.  Riveira also asserts that the full-body photograph highlights its source as a police photograph and implies criminality because he is depicted with his hands behind his back, a police officer is standing in the background, and he is standing next to the truck implicated in the alleged offense. Riveira relies on State v. Reiger, 64 Haw. 510, 644 P.2d 959 (1982), and State v. Kutzen, 1 Haw. App. 406, 620 P.2d 258 (1980), in supporting his assertion.

In Kutzen, this court adopted a three-part test (the Kutzen test) to determine whether the admission of police photographs at trial was proper:

> 1.    The Government must have a demonstrable need to introduce the photographs; and
>
> 2.    The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
>
> 3.    The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

Kutzen, 1 Haw. App. at 412-13, 620 P.2d at 262-63 (quoting U.S. v. Fosher, 568 F.2d 207, 214 (1st Cir. 1978)); see also State v. Yamada, 116 Hawaiʻi 422, 439-41, 173 P.3d 569, 586-88 (App. 2007).  But see State v. Fung, No. 30206, 2010 WL 4791966, at *1-2 (Haw. App. Nov. 23, 2010) (SDO) (applying Kutzen to determine whether the trial court erred in admitting a photograph that was undisputedly the defendant's mug shot, but did not have the common characteristics of a mug shot, while noting that "[i]t is not clear . . . whether the Kutzen test applies to every photograph of a criminal defendant obtained while in police

18

custody or whether it applies only to photographs with some associated indicia of criminal conduct").

Applying the Kutzen test here, first, the State had a demonstrable need for the photographic evidence to establish the reliability of Jayme's pretrial identification of Riveira because Riveira asserted that this was a case of mistaken identity, and Jayme admitted that she would be unable to make a definite in-court identification based on the passage of time. See Yamada, 116 Hawaiʻi at 440, 173 P.3d at 587 ("Yamada raised the defense of alibi. Accordingly, evidence that [the witnesses] had fairly picked Yamada from the photographic array was relevant and necessary to the government's case." (quoting Reiger, 64 Haw. at 512, 644 P.2d at 962) (internal quotation marks omitted)). We disagree with Riveira's contention that State's Exhibit 18 was sufficient to establish that point. Jayme's pretrial identification included a description of the suspect's plaid shorts and dark construction boots, which were not portrayed in State's Exhibit 18.

Second, the photograph depicts Riveira during the field show-up in the current case and therefore does not in and of itself imply that Riveira had a prior criminal record. Although the photograph may imply that Riveira was in custody at the time it was taken,[9] the jury could separately infer that fact through Pagaduan's and Jayme's testimonies regarding their field show-up identifications. Thus, the circuit court did not abuse its discretion in determining that the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. See HRE Rule 403.

Third, the photograph was not introduced in a manner that drew particular attention to its source or implications. Rather, the photograph was introduced during re-direct examination of Jayme and the source of the photograph was not mentioned to the jury. See Fung, 2010 WL 4791966, at *2 (noting that because the challenged photograph was introduced during

_____

[9]     The photograph depicts Riveira with his hands behind his back and leaning upon the truck implicated in the alleged offense. However, no handcuffs appear visible and the police officer in the photograph is clearly several feet away from Riveira with his back turned toward Riveira.

19

eyewitness testimony and the source of the photograph was not mentioned, it was not introduced in a manner that drew particular attention to its source or implications).

Weighing these factors, we cannot conclude that the circuit court abused its discretion in admitting State's Exhibit 17, the full-body photograph of Riveira, into evidence.

## 2. Testimony Regarding Photograph of Riveira Found in the Truck

Riveira asserts that the circuit court erred during trial when it admitted testimony that police found a photograph of Riveira in a beach bag located within the Toyota Tundra truck. Riveira argues that he did not open the door to the circuit court reconsidering the admissibility of testimony regarding the photograph, which the court had preliminarily excluded prior to trial in its ruling on Defendant's First Motion in Limine. Rivera further argues that the testimony was irrelevant to the State's theory of accomplice liability because it had not adduced evidence of who owned the bag.

During cross-examination, defense counsel questioned Detective Choy as to whether, when taking photographs of the truck, he had noticed any personal items belonging to Riveira in the truck, as follows:

> Q. Okay. There was nothing else that would indicate, like, a personal item of Mr. Riveira?
>
> A. Not that I know of.
>
> Q. Okay. The items that you took photos of, for example, the bag --
>
> A. Yes.
>
> Q. -- through your investigation you determined that -- correct me if I'm wrong -- that those items belonged to Ms. Bunao?

This line of questioning appears to have been intended to show that there was no connection between Bunao and Riveira, beyond Riveira merely being a passenger in the truck when they were apprehended. By raising the issue of the connection between Bunao and Riveira, defense counsel thus opened the door to admissible testimony pertaining to the photograph. See State v. Lavoie, 145 Hawaiʻi 409, 422-23, 453 P.3d 229, 242-43 (2019).

20

In determining the admissibility of the testimony pertaining to the photograph during the State's questioning, the circuit court held a conference outside the presence of the jury. The State proffered that the purpose of the testimony would be to counter Riveira's distancing of himself from Bunao and the truck.

In light of defense counsel's line of questioning, the testimony regarding the photograph had the tendency to make the existence of a connection between Bunao and Riveira, beyond the mere fact that Riveira was apprehended with Bunao, more probable than it would have been without the evidence. See HRE Rules 401, 402. Although the State did not show directly that the bag at issue belonged to Bunao, the State did adduce evidence that Bunao was the registered owner of the truck and was apprehended in the truck, which could permit a reasonable inference that the bag belonged to her. See State v. Silva, 67 Haw. 581, 586, 698 P.2d 293, 297 (1985) (stating that in order to be relevant under HRE Rule 401 and 402, "evidence need only be a building block of a prima facie case. It does not have to prove the case on its own." (citing State v. Irebaria, 55 Haw. 353, 356, 519 P.2d 1246, 1248-49 (1974))). Therefore, the testimony was relevant to Riveira's accomplice or principal liability in the burglary.

During the bench conference, defense counsel asserted that admission of the testimony would be prejudicial "because it'll allow the jury to think, hey, they know each other, they planned it together, one was a look-out and so forth." See HRE Rule 403.

"The balance between the evidence's probative value and prejudicial effect is 'predicated upon an assessment of the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility.'" State v. Martin, 146 Hawaiʻi 365, 383-84, 463 P.3d 1022, 1040-41 (2020) (quoting Uyesugi, 100 Hawaiʻi at 463, 60 P.3d at 864)) (some internal quotation marks omitted). Prior to the bench conference, the testimonies of State witnesses established that: Riveira was the man sitting in the truck that was pulled on the side of Uluoa Street, over a drainage grate, at around 12:35 p.m.; Riveira was the man seen

21

running from Jayme's property around 12:47 p.m.; Bunao was the woman sitting in the truck around that time; and Riveira and Bunao were the people stopped in the truck at around 12:55 p.m. by Officer Padilla. Thus, the additional testimony regarding the photograph was arguably cumulative because the prior witnesses' testimonies provided alternative proof of a connection between Riveira and Bunao, beyond the fact that Riveira was apprehended with Bunao. See id. Nonetheless, the danger of any prejudicial effect was allayed by the following instructions, which the jury is presumed to have followed:

> Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he/she is an accomplice to the commission of the offense.
>
> The burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged.

(Emphases added.) See State v. Acacio, 140 Hawaiʻi 92, 102, 398 P.3d 681, 691 (2017) (determining that a trial court's concern about unfair prejudice could be allayed by a limiting instruction); State v. Acker, 133 Hawaiʻi 253, 278, 327 P.3d 931, 956 (2014) ("[A] jury is presumed to follow the instructions it is given by the court.").

The circuit court correctly determined that the testimony was relevant and did not abuse its discretion in admitting the testimony. See Moyle, 118 Hawaiʻi at 391, 191 P.3d at 1068.

D.  **Prosecutorial Misconduct**

Riveira contends that the State engaged in prosecutorial misconduct during closing and rebuttal argument when: (1) "it asked the jury to place themselves in the Watanabes' position and invited the jury to hold Riveira 'accountable' for the sense of safety he took away from the Watanabes"; (2) "[t]he prosecutor . . . interjected his personal opinion about how 'frustrating' it was not to have direct evidence of Riveira's entry into the home, and then invited the

22

jury to join him in solidarity as to what 'we know' occurred even without that piece of evidence"; (3) "[t]he prosecutor disparaged defense counsel, accusing him of trying to 'trick' the jury"; and (4) it "tether[ed] the jurors' oaths to return a 'just verdict' solely to convicting Riveira as charged." Riveira further contends that the alleged misconduct warrants a new trial based on the lack of curative instructions and the weakness of the case, which depended solely on Jayme's testimony. It appears that at trial, Riveira objected to only the first assertion of prosecutorial misconduct. Therefore, we review the remaining assertions for plain error. See HRPP Rule 52(b).

"This court evaluates claims of improper statements by prosecutors by first determining whether the statements are improper, and then determining whether the misconduct is harmless." State v. Tuua, 125 Hawaiʻi 10, 14, 250 P.3d 273, 277 (2011) (citing State v. Kiakona, 110 Hawaiʻi 450, 458, 134 P.3d 616, 624 (App. 2006)).

Riveira's first assertion of prosecutorial misconduct comprises two arguments. First, he contends that the State improperly asked the jury to put themselves in the Watanabes' position. This argument concerns a part of the State's rebuttal argument in which it described how on that morning, the Watanabes did not expect to be burglarized, the burglary's impact on Jayme, and that Riveira took away the Watanabes' ability to feel safe in their own home. The State then recapped the evidence of Jayme's seeing Riveira fleeing her property and asked the jury to "hold the defendant accountable for what he did to that family and find him guilty as charged of Burglary in the First Degree."

Although a prosecutor is permitted to draw reasonable inferences from the evidence and is given wide latitude in discussing the evidence during closing arguments, State v. Klinge, 92 Hawaiʻi 577, 592, 994 P.2d 509, 524 (2000) (citing Rogan, 91 Hawaiʻi at 412, 984 P.2d at 1238), the part of the rebuttal argument describing the burglary's impact on the Watanabes would typically be considered improper because it encouraged the jury to sympathize with the Watanabes and how the burglary deeply affected Jayme, which had no bearing on the

central issues at trial.  See State v. Barrios, 139 Hawaiʻi 321, 329, 389 P.3d 916, 924 (2016) (determining that a prosecutor's closing argument comparing juries to hospitals and churches, and stating that "[w]hen a child needs justice, they come before a jury[,]" was an improper appeal to the jury's emotions); Klinge, 92 Hawaiʻi at 592, 994 P.2d at 524 (finding impropriety where "the prosecutor's remark could have 'diverted the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law.'" (brackets omitted) (quoting State v. Apliando, 79 Hawaiʻi 128, 142, 900 P.2d 135, 149 (1995))).  However, in addressing a previous point of error, we determined that the admission of the victim impact testimony, where there was no objection during the presentation of evidence and defense counsel further sought to utilize Jayme's testimony in this regard, did not affect Riveira's substantial rights and rise to the level of plain error.  Accordingly, because the victim impact testimony was previously admitted and did not amount to plain error, the prosecutor's brief subsequent comment on it during rebuttal argument did not amount to reversible error.  See HRPP Rule 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); State v. Machado, 109 Hawaiʻi 445, 452–53, 127 P.3d 941, 948–49 (2006) ("[E]rror is not to be viewed in isolation and considered purely in the abstract.  It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.  In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction." (emphasis omitted) (quoting State v. Haili, 103 Hawaiʻi 89, 100, 79 P.3d 1263, 1274 (2003))).

The second part of Riveira's first assertion of misconduct concerns the end of the State's rebuttal argument, where the State requested that the jury "hold the defendant accountable for what he did to that family and find him guilty as charged of Burglary in the First Degree."  Contrary to Riveira's assertion, the State did not ask the jury to "hold Riveira 'accountable' for the sense of safety he took away from the

24

Watanabes."  Rather, when read in the context of the State's closing and rebuttal arguments, the State was commenting on the evidence adduced at trial, and the reasonable inferences that could be drawn from the evidence, in an attempt to convince the jury of its theory of the case and to hold Riveira responsible based on the evidence.  See State v. Pasene, 144 Hawaiʻi 339, 367, 439 P.3d 864, 892 (2019) ("Prosecutors may state, discuss, and comment on the evidence as well as draw all reasonable inferences from the evidence.  In other words, closing argument affords the prosecution the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom." (ellipsis, internal quotation marks, and citations omitted)).

As to the second assertion of prosecutorial misconduct, Riveira argues that the prosecutor inserted his personal opinion by commenting that it was "frustrating" not to have direct evidence of Riveira's entry into the home, and that the prosecutor invited the jury to join him in solidarity by laying out the evidence "we know."  The first part of the comment was made in the context of describing the case as a 100-piece jigsaw puzzle.  The State argued that although the case might be missing direct evidence of Riveira's entry into the dwelling, that was only one piece of the puzzle and the case contained the other pieces of the puzzle in the form of circumstantial evidence.  The State then related, "Is it frustrating?  Absolutely.  Is it necessary?  No.  Because we have all the other pieces, we know what the puzzle is a picture of.  We know what the puzzle is a picture of, and that picture is the defendant as the person who burglarized their home."  The State's analogy to a jigsaw puzzle and statement of the frustration that comes with not having a piece, was a comment on the evidence adduced at trial and did not use the pronoun "I" or otherwise reflect the prosecutor's personal opinion.  See Pasene, 144 Hawaiʻi at 367, 439 P.3d at 892; State v. Sanchez, 82 Hawaiʻi 517, 534, 923 P.2d 934, 951 (App. 1996) (determining that the prosecutor improperly asserted "personal evaluation of the credibility of certain witnesses in final argument" by using the personal pronoun "I" (emphasis

25

omitted)).  Moreover, the prosecutor's use of the phrase "we know" in a few instances was done as part of commenting on the evidence.  We conclude that reading the statements in proper context, they were not improper.

Addressing Riveira's third assertion of misconduct, we agree that the prosecutor's statement to the jury, "Well, the folks [defense counsel's] trying to trick are you with his interpretation of the evidence[,]" was improper.  Although the prosecutor's assessment of defense counsel may have had a basis in the evidence, "[a] prosecutor's comment is clearly misconduct where it 'constitutes an impermissible attack on defense counsel's integrity' and 'operates to denigrate the legal profession in general.'"  Pasene, 144 Hawaiʻi at 370, 439 P.3d at 895 (original brackets omitted) (quoting Klinge, 92 Hawaiʻi at 595, 994 P.2d at 527); see State v. Underwood, 142 Hawaiʻi 317, 327, 418 P.3d 658, 668 (2018) ("Insinuations that a criminal attorney's zealous defense of a client amounts to unethical behavior strike at the foundation of our adversarial system and 'should not be tolerated by either the trial judge or the bar.'" (quoting U.S. v. Linn, 31 F.3d 987, 993 (10th Cir. 1994))); Klinge, 92 Hawaiʻi at 595, 994 P.2d at 527 (determining that a prosecutor's comment during closing argument, stating that defense counsel would not give the jury "the whole picture" because it was his duty to "get his client off," was clearly prosecutorial misconduct because it was an impermissible attack on defense counsel's integrity).

In his fourth assertion of misconduct, Riveira challenges the prosecutor's statement to the jury at the end of his closing argument, "you took an oath to render a just verdict according to the facts and the law, and I ask that you follow your common sense, your sound judgment, and you find the defendant guilty as charged of Burglary in the First Degree." This statement was not improper as it did not invite the jury to base its verdict on anything other than the evidence in this case and the law as instructed by the circuit court.  See Klinge, 92 Hawaiʻi at 592, 994 P.2d at 524; cf. State v. Schnabel, 127 Hawaiʻi 432, 451-52, 279 P.3d 1237, 1256-57 (2012) (determining

26

it was improper for the prosecutor to advise the jury during closing arguments that the jury instructions were "mumbo jumbo," "could be disregarded, and that the jurors could decide the question of guilt based on their 'gut feeling'" (footnote omitted)).

We now turn to whether the alleged instances of misconduct were harmless. "In evaluating whether alleged prosecutorial misconduct amounts to harmful error, this court considers '(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.'" Underwood, 142 Hawaiʻi at 325, 418 P.3d at 666 (quoting Rogan, 91 Hawaiʻi at 412, 984 P.2d at 1238). "Misconduct requires vacating a conviction when, in light of these factors, 'there is a reasonable possibility that the error complained of might have contributed to the conviction.'" Id. (quoting Rogan, 91 Hawaiʻi at 412, 984 P.2d at 1238).

The nature of the State's improper statement, as discussed above, was an insinuation that defense counsel was trying to "trick" the jury. This instance of misconduct, however, was not of a repeated nature, see Pasene, 144 Hawaiʻi at 371, 439 P.3d at 896 (considering the repetitive nature of the misconduct in the first prong of its prosecutorial misconduct analysis), and was not as severe as those instances the supreme court has found harmful. See Tuua, 125 Hawaiʻi at 16, 250 P.3d at 279 ("This court evaluates the severity of the conduct in determining whether the first factor favors holding that an improper statement was harmless."); see, e.g., Underwood, 142 Hawaiʻi at 326-27, 418 P.3d at 667-68 (determining that prosecutor's insinuation that the defendant and defense counsel sought to induce the complaining witness to commit perjury, with no basis in the record, weighed in favor of vacating the conviction); Rogan, 91 Hawaiʻi at 414, 984 P.2d at 1240 (determining that "the statement that the incident was 'every mother's nightmare[]' . . . was a blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position").

27

As to the second factor, the circuit court gave a general instruction that closing arguments were not evidence, but did not give any specific curative instructions, because there were no objections.  See Underwood, 142 Hawaiʻi at 328, 418 P.3d at 669 (concluding that the second prong weighed in favor of vacating the defendant's conviction because, inter alia, the circuit court's prior general instruction was unlikely to cure the prejudice created by the prosecutor's specific improper remarks and no other curative measure was taken).

The third factor weighs in favor of finding the misconduct harmless.  Although Jayme's credibility was a critical factor in the case, her identification of Riveira was corroborated by both the identification by Pagaduan, who was a disinterested witness, and the recovery of the stolen items in the truck in which Riveira was apprehended.  See Tuua, 125 Hawaiʻi at 17, 250 P.3d at 280 ("In close cases involving the credibility of witnesses, particularly where there are no disinterested witnesses or other corroborating evidence, this court has been reluctant to hold improper statements harmless.").

Balancing these three factors, and based on the entire record, we conclude that the prosecutorial misconduct was harmless beyond a reasonable doubt.

E.   **Accomplice Liability Instruction**

Riveira contends that the circuit court erred in instructing the jury, over defense counsel's objection, on accomplice liability.  In particular, Riveira argues there was no evidence at trial that would support a conclusion that Bunao was the principal and Riveira was her accomplice.

The circuit court instructed the jury as follows:

> A defendant charged with committing an offense may be guilty because he/she is an accomplice of another person in the commission of the offense.  The prosecution must prove accomplice liability beyond a reasonable doubt.
>
> A person is an accomplice of another in the commission of an offense if:
>
> > 1.  With the intent to promote or facilitate the commission of the offense, he/she

> a. solicits the other person to commit it; or
>
> b. aids or agrees or attempts to aid the other person in the planning or commission of the offense;
>
> Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he/she is an accomplice to the commission of the offense.

Riveira argues that the evidence showed that a man was seen running from Jayme and Ryan's home, and that Riveira's mere association with Bunao, presence in the truck, or knowledge of her involvement in the burglary were insufficient for an accomplice liability instruction.

"[T]his court [has] held that 'it is not error to submit an instruction covering a theory advanced by a party if there is _any_ evidence on which to base it, although it may be slight and inconclusive, or opposed to the preponderance of the evidence.'" State v. Keaweehu, 110 Hawaiʻi 129, 134, 129 P.3d 1157, 1162 (App. 2006) (emphasis in original) (original brackets omitted) (quoting State v. Tucker, 10 Haw. App. 73, 80, 861 P.2d 37, 42 (1993)). Here, the evidence was such that a jury could infer that Riveira's involvement extended beyond his mere association with Bunao, presence in the truck, or knowledge of Bunao's involvement in the burglary, and that Riveira acted as an accomplice to Bunao in the charged burglary. For example, Riveira himself was observed fleeing the Watanabes' yard with a black electronic device, he was seen near and Bunao was seen in front of the Watanabes' house prior to or during the alleged burglary, and both were later apprehended in Bunao's truck with the Watanabes' stolen property, including several electronic devices beyond what Riveira was seen carrying away. See id.; see also Acker, 133 Hawaiʻi at 286, 327 P.3d at 964 ("It is well settled that one who is charged as a principal can be convicted as an accomplice without accomplice allegations being made in the indictment." (emphasis and internal quotation marks omitted) (quoting State v. Fukusaku, 85 Hawaiʻi 462, 486, 946 P.2d 32, 56 (1997))). Therefore, the accomplice liability instruction was

not prejudicially insufficient, erroneous, inconsistent, or misleading.  See Cullen, 86 Hawaiʻi at 8, 946 P.2d at 962.

### F.    Cumulative Effect of Errors

After carefully reviewing the record, we conclude that the individual errors raised by Riveira are by themselves insubstantial.  Accordingly, it is unnecessary to address Riveira's contention that the cumulative effect of the "alleged errors" requires reversal.  See State v. Samuel, 74 Haw. 141, 159, 838 P.2d 1374, 1383 (1992).

### V.    Conclusion

For these reasons, the circuit court's September 26, 2017 Judgment of Conviction and Sentence is affirmed.

DATED:  Honolulu, Hawaiʻi, December 11, 2020.


On the briefs:

Salina Kanai Althof
for Defendant-Appellant.

Stephen K. Tsushima,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge